DAVID SEROR – Bar No. 67488
JESSICA L. BAGDANOV – Bar No. 281020
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email: dseror@bg.law
jbagdanov@bg.law

Attorneys for Sam Leslie,
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

In re

COLDWATER DEVELOPMENT, LLC, a California limited liability company,

Debtor.

In re

LYDDA LUD, LLC, a California limited liability company,

Debtor.

☒ Affects both Debtors.

☐ Affects Coldwater Development LLC only.

☐ Affects Lydda Lud, LLC only.

Debtors.

Case No. 2:21-bk-10335-BB

Chapter 11

Jointly Administered with
Case No. 2:21-bk-10336-BB

**CHAPTER 11 TRUSTEE'S NOTICE OF MOTION AND MOTION TO:**

**(I) APPROVE AUCTION AND BID PROCEDURES REGARDING THE SALE OF REAL PROPERTY; AND**

**(II) SET SCHEDULING FOR A MOTION TO APPROVE THE SALE OF REAL PROPERTY**

**MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF SAM S. LESLIE AND DAVID SEROR**

<u>Hearing</u>:
Date: March 2, 2022
Time: 10:00 a.m.
Place: Courtroom 1539

## TABLE OF CONTENTS


Page

MEMORANDUM OF POINTS AND AUTHORITIES ..... 10

I. RELEVANT BACKGROUND ..... 10

A. Procedural History ..... 10

B. The Marketing Process ..... 10

C. Secured Creditor Give Back LLC ..... 11

II. ARGUMENT ..... 11

A. The Bid Procedures Should Be Approved ..... 11

B. Give Back LLC Should be Required to Pay a Buyer's Premium on Any Bid Over its Allowed Secured Claim ..... 12

C. The Sale Motion Scheduling Should Be Approved ..... 16

III. CONCLUSION ..... 17

DECLARATION OF SAM S. LESLIE ..... 18

DECLARATION OF DAVID SEROR ..... 20

**TABLE OF AUTHORITIES**

Page

**CASES**

*In re A-1 Plank & Scaffold Manufacturing, Inc.*, 437 B.R. 689 (Bankr. D. Kan. 2010) .....14, 15

*In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) .....11

*In re NJ Affordable Homes Corp.*, 2006 WL 2128624 (Bankr. D. NJ. June 29, 2006) .....14

**STATUTES**

11 U.S.C. § 327 .....13, 20

**PLEASE TAKE NOTICE t**hat Sam S. Leslie, the duly appointed and acting Chapter 11 Trustee (the "Trustee") of the bankruptcy estates ("Estates") of Coldwater Development, LLC ("Coldwater Debtor") and Lydda Lud, LLC ("Lydda Debtor") (collectively, the "Debtors"), hereby moves (the "Motion"), pursuant to Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 6004-1(b) and 9075-1, for entry of an order:

A. Approving the proposed bid procedures regarding the auction ("Auction") and sale of the Debtor's real property (defined herein as the "Property"), as set forth in the Terms and Conditions of Sale ("the "Bid Procedures") attached hereto as **Exhibit 1** and are summarized as follows:[1]

1. **Auction Date.** The auction sale shall take place on March 24, 2022, concurrently online and in-person.

2. **Properties for Sale.** The properties being offered for are identified by Assessor's Parcel Number 4387-021-018 and 4387-021-019, 4387-022-001, 4387-022-002, 4387-020-001, 4387-020-009 (the "Properties"). Interested parties may submit a bid for all, one, or some of the Properties.

3. **Requirement of Bid Deposit**:

   a. **Onsite Bidders-** Bids on the Properties will be accepted only from persons who attend the Auction, **have in their possession a cashier's check in the amount of two hundred fifty thousand dollars ($250,000.00)**, payable to Sam Leslie, Chapter 11 Trustee, and register with the Auctioneer prior to the Auction ("Qualified Bidders"). Only Qualified Bidders will be permitted to attend the auction.

   b. **Online Bidders -** A bid deposit in the amount of two hundred fifty thousand dollars ($250,000.00), payable to Sam Leslie, Chapter 11 Trustee will be required in order to bid. The deposit will be required in the form of a Cashier's Check,

[1] To the extent there is any discrepancy between this summary and the actual terms of the Bid Procedures set forth in **Exhibit 1**, the actual terms of the Bid Procedures set forth in **Exhibit 1** shall govern in all respects.

remitted to Seller no later than 48 hours prior to the auction date, which the Seller may hold until the completion of bidding and for a reasonable period of time to allow for the release of any such deposit and/or the return of any such funds after the conclusion of the auction. Online bidders will also be required to complete bidder registration forms as supplied by the Auctioneer, which will contain further instructions for remitting the deposit.

4. **Suggested Opening Bids and Offering**. The Properties will be offered with Suggested Opening Bid amounts. Auctioneer may offer the Properties for sale as individual parcels, in parcel groupings, and/or in their entirety. Auctioneer may reopen bidding over multiple rounds, whereby Qualified Bidders will be provided the opportunity to increase their bids and alter the parcel combination of their bids if such increases and alterations bring a better result to the Seller. The auction sale will not be deemed closed on any parcel or combination of parcels until Auctioneer announces the conclusion of the auction and determination of the highest and best bids. At such time, Seller, in his sole discretion, shall have the authority to accept or reject the high bids established by the Auctioneer.

5. **Opening Bid Incentive:** Auctioneer and Seller, in their sole discretion, may offer a Qualified Bidder who agrees to open the auction for one or more parcels at a bid amount acceptable to Auctioneer and Seller, minimum overbid protection of approximately 3% of their opening bid.

6. **Sale Subject to Confirmation:** The auction sale is subject to confirmation of the Seller in his sole and absolute discretion, who is selling solely in his capacity as Trustee and the high bidder only becomes the purchaser upon confirmation and acceptance by the Seller, and approval by the bankruptcy court following conclusion of the auction. The Seller is unconditionally authorized to decline to confirm the sale of the Properties and to cancel the sale of the Properties through close of escrow.

7. **Bid Increments**: Once a bid is received by the Auctioneer, advances on that bid must be made in increments at least as great as those which the Auctioneer, at his sole discretion, shall designate as being necessary to surpass the last bid acknowledged by the Auctioneer. Should there be any dispute among competitive bidders for the Properties, the Auctioneer may reopen bidding on

the Properties or he may, at his sole discretion, designate one of the bidders as the "High Bidder".

8. **Buyer's Premium:** A buyer's premium of three percent (3%) shall be added to the High Bidder's high bid price and become part of the total purchase price to be paid by the High Bidder.

a. **Buyer's Broker.** In the event the Property is purchased by a third party represented by a registered broker, the buyer's broker will be paid 1% of the high bid, to be paid from the Buyer's Premium through escrow. The remaining 2% will be paid to the Auctioneers. In the event a third party buyer is not represented by a broker, 1% of the Buyer's Premium will be rebated back to the estate, with the remaining 2% paid to the Auctioneers.

b. **Credit Bid.** In the event Give Back, LLC purchases any or all of the Properties for amount(s) up to its allowed credit bid, no Buyer's Premium will be assessed. In the event that Give Back, LLC purchases one or all of the Properties for a total exceeding its credit bid amount, then Give Back, LLC will be assessed the Buyer's Premium which shall be distributed as follows: 1.5% to the Estate and 1.5% to the Auctioneer.[2]

9. **Earnest Money Deposit:** At the conclusion of bidding on the Properties, the High Bidder will be required to confirm its bid amount and tender its $250,000.00 cashier's check as deposit. The High Bidder(s) will also be required to tender any necessary additional deposit to bring its total deposit to an amount equal to ten percent (10%) of the total purchase price ("Earnest Money Deposit"), payable within 24 hours following the auction. The additional deposit may be by cashier's check or wire transfer. The Earnest Money Deposit shall be held by Sam Leslie, Chapter 11 Trustee until close of escrow.

10. **Purchase Contract:** The High Bidder(s) will be required to sign a Purchase Contract

---

[2] Please note that the inclusion of this credit bid language conflicts with Trustee's counsel's representations made during the hearing regarding the Trustee's prior application to employ the Auctioneer to begin marketing efforts. The Trustee filed a motion to clarify in light of this mistake [Doc. 245] and requested that the matter be set on shortened notice. However the Trustee submits that it is more efficient to resolve this issue in connection with bid procedures. Thus, this specific issue is addressed in the Memorandum, *infra*, section II.B.

("Purchase Contract") immediately upon the completion of the auction. The Purchase Contract will set forth the "Purchaser", the "Seller", the "Broker(s)", and contain the precise terms and conditions of the sale. The Purchase Contract will be made available for review prior to the auction by the Auctioneer. *See also* **Exhibit 2.**

11. **High Bidder's Default:** If the High Bidder fails to close in a timely manner for any reason, the Earnest Money Deposit shall be immediately forfeited and released to Seller as liquidated damages and not as a penalty. Seller retains the unilateral right to cancel any escrow and retain the Earnest Money Deposit in the event the High Bidder fails to complete the purchase as required by the terms of the Purchase Contract. In addition, **in the event the High Bidder fails to submit the executed Purchase Contract and any required Earnest Money Deposit as required by these Terms and Conditions and any additional terms and conditions, the High Bidder authorizes the Seller to retain the Earnest Money Deposit, in the sole discretion of the Seller.** These remedies are in addition to any other remedies, including specific performance and/or additional monetary damages that the Seller and/or the Auctioneer may have in equity or at law. The Auctioneer and the Seller also reserve the right to immediately put the Properties up for sale again.

12. **No Conditions or Contingencies:** Without limiting the generality of the foregoing, bidders acknowledge and agree (i) that the completion of the sale following the conclusion of the auction is not contingent upon any inspection or verification of any such information, and the Closing Date or Closing Time (as defined below) will not be extended in order to permit any such inspection or review; (ii) that neither the Seller nor the Auctioneer nor any broker participating in the transaction to which this auction relates shall have any liability for any relief, including damages of any kind, rescission or reformation of the Purchase Contract or adjustment to the terms of the Purchase Contract based upon any failure of the Properties to conform to any description contained in the Property Information Package or any other materials, or to any standard or any expectation that bidders may have in connection with the Properties; and (iii) that the completion of the sale is not subject to any financing or other contingency of any sort. Bidders represent and warrant that by registering to bid and bidding during the auction, bidders have conducted all necessary investigations, and have determined to place a bid relying solely on their own independent

investigation or verification of material facts concerning the sale and the suitability of the Properties for their intended use.

13. **"AS-IS" Sale**: All bidders are encouraged to personally inspect the Properties and documentation relating thereto. The Properties are being sold "as-is, where is" with no representations or warranties whatsoever. The sale is not contingent upon inspection and will not be extended for that purpose. Neither Seller nor Auctioneer make any warranties or representations, either expressed or implied, concerning the Properties included in the sale. Neither Seller nor Auctioneer shall be liable for any relief, including damages, rescission, reformation, allowance or adjustment based on the failure of the Properties to conform to any standard or expectation.

14. **Due Diligence:** It is bidder's responsibility to obtain and read the Property Information Package relating to the Properties being sold at the auction, as well as any and all other information made available by the Auctioneer relating to this auction and the Properties being sold at the auction. Bidders acknowledge and represent that they have done so. Bidders further acknowledge that any information contained in the Property Information Package or otherwise obtained directly or indirectly from the Auctioneer and/or the Seller is being presented to the best of the Auctioneer's and the Seller's actual knowledge without independent verification. Therefore, it is the sole and exclusive responsibility of bidders to inspect the Properties; review the documents relating to the Properties; assess the accuracy and completeness of the information contained in the Property Information Package and any such other documents; and independently verify and confirm any estimates, projections, or assumptions relating thereto, none of which may be considered to be guaranties. In connection therewith, bidders have the sole and exclusive responsibility to select and consult with any and all professional advisors of their choosing in determining whether to bid at this auction. Bidders acknowledge that they have relied exclusively on their own investigations and determinations and the advice or their own professional advisors, and expressly represent that they have not relied upon any information provided by the Seller or the Auctioneer in any way, whether through the Property Information Package or other documents, through the Auctioneer's website(s), or by any oral, written or electronic communications with the Auctioneer or the Seller, or otherwise.

15. **Title:** The sale will be fee simple title by Quitclaim Deed, **as is**, with a standard

coverage title policy provided by Seller subject only to current taxes, assessments, easements, rights-of-way, conditions, restrictions, other matters of record and any printed exceptions specified in the preliminary title report except monetary liens.

16. **Close of Escrow:** All sales must close within thirty (30) days but no sooner than fourteen (14) days following entry of the Court Order confirming the sale. If a High Bidder fails to close in a timely manner for any reason, the High Bidder's deposit(s) shall be immediately forfeited and released to Seller as liquidated damages and not as a penalty. Seller retains the unilateral right to cancel escrow and retain the deposit in the event the High Bidder fails to close as required by the terms of the Purchase Agreement.

17. **Closing Costs:** Property taxes will be pro-rated as of the date of Close of Escrow. The High Bidder will be required to pay their own closing costs, including, but not limited to escrow fees, document preparation fees, transfer taxes, recording fees, and property tax prorations. The Seller will pay standard coverage title insurance fees and their portion of the escrow fees.

18. **Broker Participation:** Broker participation is welcomed. A commission of 1% of the Buyer's Premium on the high bid price will be paid to the licensed California real estate broker whose prospect pays the entire purchase price, including Buyer's Premium, and closes on the Properties. To qualify for a commission, the real estate broker must: (a) be a licensed California real estate broker who will abide by the National Association of Realtors Code of Ethics, (b) sign an affidavit stating his/her involvement is serving only as broker and not as a principal, (c) first register the prospect by completing the Broker Registration Agreement (available from the Auctioneer's office) and returning it by fax to 949.727.9022 or e-mail to tcook@tranzon.com no later than 48 hours prior to the scheduled auction; and the registration form must be signed by the prospect and received before any inspection of the Properties by the prospect. The broker must be present at the auction to submit the bid with their prospect. Each broker must submit a copy of the faxed or e-mailed form when their prospect registers for the auction. A complete registration file on all prospects will be maintained. Referral fees will only be paid upon closing and receipt of commissions by Auctioneer.

**AND**

B. Setting the following scheduling for a motion to approve the sale of the Property (the "Sale Motion Scheduling"):

| **Date** | **Event** |
|---|---|
| March 24, 2022 | Auction Sale |
| March 25, 2022 | Deadline for Trustee to file and serve motion to confirm the sale of the Property to successful bidder (the "Sale Motion") |
| March 29, 2022 | Deadline for any parties in interest to file and serve any oppositions to the Sale Motion |
| Orally at the hearing | Deadline for any parties in interest to file and serve any replies to any oppositions to the Sale Motion |
| March 30, 2022 at 10:00 a.m. | Hearing on the Sale Motion |

**PLEASE FURTHER TAKE NOTICE** that as required by LBR 6004-1(b)(2), the Trustee provides the following information regarding the marketing efforts undertaken and the anticipated additional marketing efforts to be undertaken for the Property, as follows:

The Auctioneers have done/intend to do the following:

1. **Identify the Target Market.** The Auctioneer intend to analyze the likely target market for the Property, which will likely include: Developers and Investors, the Real estate brokerage community, and Auctioneer's exclusive database of previous buyers and interested parties.

2. **Digital Advertising Efforts.** Auctioneer will craft a digital marketing campaign using keywords, unique ad text and an effective landing page. Ads will be designed for optimal performance across the target market.

3. **Display Advertising.** Auctioneer will prepare and place attractive, high-impact press releases and advertisements in various newspapers and other periodicals in order to attract potential buyers. Ads will contain the sale date and time, property photos, and property highlights based on publication and target audience. Ads will also contain a toll free phone number and web address for easy access to further information. Ads will be placed in an appropriate selection of international, national, regional and local publications. Display ads would appear in some combination of print media and/or their online equivalents, including:

a. Los Angeles Times

b. Wall Street Journal

c. Beverly Hills Courier

4. **Internet Advertising**. The Property will be listed in detail on the Tranzon website with professional photos and aerial drone footage. The Tranzon website averages over 85,000 hits per business day. The site is commonly filled with sales across the United States and draws the highest auction firm viewer-ship rates in the industry. When a property is posted on this website it is automatically linked with up to 73 additional websites. The other websites include area MLS services, Property Line, LoopNet, CCIM, CoStar, GlobeSt.com, and Auctioneers Association websites. Website advertising will also be utilized on various media sites, including digital ads in the Wall St. Journal and the Los Angeles Times. The sale is currently posted on the following websites:

Tranzon.com
360bid.sale
Tranzon360.com

5. **E-Mail Notification.** Tranzon360 submits email distributions via a number of nationwide services to auction buyers, real estate brokers and investors. The proprietary database has over 500,000 members who have visited the website and subscribed to the property list based on their registered property type and geography interest. E-mail has been successfully utilized in the past and is an excellent conduit for reaching national and international buyers in a timely fashion.

6. **Property Information Package.** Auctioneer will produce a Property Information Package (PIP) containing all available information on the auction and property, including complete terms and conditions of sale, template as-is purchase agreement, updated title commitment, photographs, floor plans, etc. The package will be available in paper and electronic formats. These materials will be available online to those who provide required con- tact information.

7. **Telemarketing.** Each individual who inquires will receive follow-up calls from a licensed Tranzon360 professional multiple times prior to the auction. This high-touch approach continues up to and including auction day.

8. **Public Relations.** Working cooperatively, Auctioneer will establish a "buyer-friendly" marketing message which explains the basis for the sale. This message will be controlled

and will greatly enhance the public's awareness of and interest in the situation. Explaining the bankruptcy process will be central to this. It is imperative that a firm comfortable in and familiar with bankruptcy deliver the message so that it enhances rather than detracts from the opportunity. The public, without proper conditioning, can be apprehensive about the bankruptcy process. Thus, Auctioneer will actively educate potential bidders about the process to alleviate any potential concerns.

**PLEASE TAKE FURTHER NOTICE THAT PURSUANT TO LBR 6004-1(B)(4), ANY OPPOSITION TO THIS MOTION MUST BE FILED AND SERVED BY NO LATER THAN ONE (1) DAY PRIOR TO THE HEARING ON THE MOTION.**

**WHEREFORE**, the Trustee respectfully requests that the Court enter an order granting this Motion, approving the Bid Procedures, approving the Sale Motion Scheduling, and granting such other and further relief as the Court deems just and proper under the circumstances.

DATED: February 17, 2022

BG LAW LLP

By: /s/ Jessica L. Bagdanov
David Seror
Jessica L. Bagdanov
Attorneys for Sam Leslie, Chapter 11 Trustee

**MEMORANDUM OF POINTS AND AUTHORITIES[3]**

# I. RELEVANT BACKGROUND

## A. Procedural History

On January 15, 2021 (the "Petition Date"), the Debtors filed their voluntary petitions under Chapter 11 of title 11 of the Bankruptcy Code (the "Cases"). The Cases are jointly administered pursuant to this Court's Order entered January 21, 2021 in the Cases.

The Debtors collectively own six (6) highly prized, vacant, residential estate lots, totaling approximately 65.63 acres located in the Santa Monica Mountains above Beverly Hills, California (the "Property"). More specifically, the Coldwater Debtor owns two (2) lots identified by Assessor's Parcel Number 4387-021-018 and 4387-021-019, and the Lydda Debtor owns four (4) lots identified as Assessor's Parcel Number 4387-022-001, 4387-022-002, 4387-020-001, 4387-020-009.

On December 7, 2021, the Office of the United States Trustee "("OUST") filed its Application to Appoint a Chapter 11 Trustee in the Cases [Doc. 191], pursuant to which the OUST sought the immediate appointment of a Chapter 11 Trustee. Thereafter, this Court granted the OUST Application and appointed the Trustee in the Cases. On December 7, 2021, the OUST filed its Notice of Appointment of Chapter 11 Trustee [Doc. 193], and pursuant to Court order entered December 7, 2021 [Doc. 195], Sam S. Leslie was appointed Chapter 11 Trustee and continues to serve in that capacity in the Cases.

## B. The Marketing Process

Prior to the Trustee's appointment, the Debtors marketed the Property to several parties both pre- and postpetition. Since his appointment, the Trustee has spent considerable time and effort in a short period of time investigating the Property and its purported secured debt to determine whether the Property may be liquidated for the benefit of these Estates.

On February 9, 2022, the Court approved the Trustee's retention of ThreeSixty Asset Advisors, LLC and WFS Inc. dba Tranzon Asset Strategies to serve as auctioneers for the marketing and sale of the Property (the "Auctioneers"). With the assistance of the Auctioneers, the Trustee has

[3] Unless otherwise stated, capitalized terms in this Memorandum have the same meanings ascribed to them in the preceding Notice of Motion and Motion.

formulated the Terms and Conditions of Sale, attached hereto as **Exhibit 1** (the "Bid Procedures"). The Bid Procedures contemplates approximately six (6) weeks of marketing efforts, followed by an auction sale, followed shortly thereafter by a hearing to confirm the sale to the successful bidder, which the Court previously reserved as March 30, 2022 at 10:00 a.m.

**C. Secured Creditor Give Back LLC**

The Trustee is aware the Give Back, LLC ("Give Back") holds a claim secured by the Property. On March 9, 2021, Give Back filed a motion for relief from the automatic stay [Doc. 59], in which Give Back claims it is owed nearly $30,000,000 on account of its lien. The Debtor has disputed the amount of the secured claim in the past. The Trustee is informed that, as between Give Back and the Debtor, the stipulated or undisputed amount of Give Back's claim was $27,265,211.02. *See, e.g.,* prior Order approving bid procedures, entered September 17, 2021 [Doc. 146], p. 9. The Trustee will not object to Give Back exercising its rights under section 363(k) to credit bid up to this undisputed amount of $27,265,211.02. The Trustee reserves all rights to challenge the remainder of Give Back's claim if appropriate.

## II. ARGUMENT

**A. The Bid Procedures Should Be Approved**

Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure govern the scope of the notice to be provided in the event a debtor in possession or trustee elects to sell property of the estate under Section 363. However, with respect to the procedures to be adopted in conducting a sale outside the ordinary course, Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the trustee provide an itemized list of the property sold together with the prices received upon consummation of the sale. Fed. R. Bankr. P. 6004(f).

Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure contain specific provisions with respect to the procedures to be employed by a trustee in conducting a public or private sale. Nonetheless, as one Court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Additionally, courts have long recognized

the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*

The Court here should similarly approve the proposed Bid Procedures. The Trustee believes that the proposed Bid Procedures detailed herein will maximize the price ultimately obtained for the Property while still protecting the estate from parties who may wish to bid on the Property but who are ultimately unable to consummate a purchase of the Property. The Bid Procedures serve numerous legitimate purposes. Among other things, the Bid Procedures will (1) foster competitive bidding among any serious potential purchasers, (2) eliminate from consideration purchasers who would waste the estate's time because they would not have the financial ability to consummate a purchase of the Property, and (3) ensure that the highest possible price is obtained for the Property. Indeed, considering the substantial value of these Properties, requiring potentially interested bidders to provide a $250,000 deposit in order to qualify for bidding ensures that only serious bidders are included in the sale process.

In addition to the foregoing, the Bid Procedures satisfy all the requirements for the approval of the Bid Procedures pursuant to LBR 6004-1(b). First, the Notice of the Motion filed concurrently herewith describes the Bid Procedures. Second, a copy of the form Purchase and Sale Contract in substantially the form to be used by bidders is attached hereto as **Exhibit 2.** Third, the Notice of the Motion describes marketing efforts that have already been undertaken by the Auctioneer, and the anticipated additional marketing efforts to be made by the Auctioneer. Based on the foregoing, the Trustee submits that the proposed Bid Procedures are reasonable and in the best interests of the estate and, therefore, should be approved.

**B. <u>Give Back LLC Should be Required to Pay a Buyer's Premium on Any Bid Over its Allowed Secured Claim</u>**

As noted above, the Bid Procedures include a provision stating that, if Give Back, LLC, the secured creditor, is the successful bidder at the auction and merely credit bids, it need not pay the Buyer's Premium. However, if Give Back, LLC enters the bidding and decides to bid over its

allowed credit bid amount, it must pay the Buyer's Premium calculated on its full bid. The specific language noted above is as follows:

> In the event Give Back, LLC purchases any or all of the Properties for amount(s) up to its allowed credit bid, no Buyer's Premium will be assessed. In the event that Give Back, LLC purchases one or all of the Properties for a total exceeding its credit bid amount, then Give Back, LLC will be assessed the Buyer's Premium which shall be assessed the Buyer's Premium which shall be distributed as follows: 1.5% to the Estate and 1.5% to the Auctioneer.

*See* **Exhibit 1**, ¶ 8(b).

On February 9, 2022 a hearing was held on the Trustee's *Motion For Order Approving Retention of ThreeSixty Asset Advisors, LLC and WFS Inc., dba Tranzon Asset Strategies as Auctioneers Pursuant to 11 U.S.C. § 327 and Approving Auctioneer's Proposed Costs* (the "Motion to Employ") [Doc. 226]. In general, the Motion to Employ provides that a successful bidder on the Property (as defined in the Motion to Employ) would be required to pay a Buyer's Premium of 3% of the successful bid. At the hearing, a discussion was had, on the record, concerning the circumstances under which secured creditor Give Back would be required to pay a Buyer's Premium. During that discussion, David Seror, counsel for the Trustee stated that Give Back would not be required to pay a Buyer's Premium on its credit bid. That is a correct statement and the Motion to Approve Bid Procedures, yet to be filed, will contain language to that effect. However, the discussion on this issue also included whether Give Back would be required to pay a Buyer's Premium on amounts bid in excess of its credit bid. In the course of that discussion, Seror mistakenly stated a Buyer's Premium of 3% would be required solely on the difference between the credit bid amount and the actual amount bid. That statement was incorrect and inconsistent with the proposed Bid Procedures.

On February 9, 2022, after the hearing, Seror spoke with counsel for Give Back and told them that he misspoke at the hearing and that the Bid Procedures Motion would provide that Give Back would be obligated to pay a Buyer's Premium on its entire successful bid if its bid exceeded its credit bid. Efforts to arrive at a consensual order following the Motion to Employ were not successful.

///

Requiring Give Back, LLC to pay a full Buyer's Premium of 3% of the ultimate purchase price is consistent with the Trustee's need to maximize value for the estate from the sale and ensure a competitive bidding process. Case law allows for bidding procedures to charge a credit bidding secured creditor with commission or a buyer's premium—even in a situation where the secured creditor merely credit bids and does not exceed its secured amount (which Give Back will not be required to pay in this sale if its credit bid is the only bid). For example, in the case of *In re NJ Affordable Homes Corp.,* 2006 WL 2128624 (Bankr. D. NJ. June 29, 2006),[4] the bankruptcy court permitted an institutional lender to credit bid but required the lender to pay a 10% buyer's premium if it became the successful bidder. 2006 WL 2128624, at *16. The court explained as follows:

> Consequently, while the Institutional Lenders shall have the right to credit bid at the auction sale, any Institutional Lender that is the successful bidder with respect to each individual property shall be required to pay the ten percent (10%) "Buyer's Premium" to the Joint Venture. **This Buyer's Premium is, of course, in lieu of the costs a lender would incur to foreclose, market, and sell the property**.

*Id.* (emphasis added).

Similarly, in *In re A-1 Plank & Scaffold Manufacturing, Inc.,* 437 B.R. 689 (Bankr. D. Kan. 2010), the bankruptcy court considered a bank's objection to paying commission to a broker where its credit bid was the ultimately successful bid. The court conducted a detailed analysis and ordered the bank to pay the commission, noting that the broker's efforts in marketing benefitted both the estate and the lender, explaining as follows:

> At issue here is whether Weigand [the broker] should be paid a commission on the $800,000 Sizewise cash bid even though the Bank's credit bid took the sale. . .
>
> There is no question that the Bank was within its rights to credit-bid as much of its claim as it saw fit. . . .
>
> If credit-bidding by the senior lender defeated any compensation to the estate's realtor, there would rarely be an incentive for any realtor to participate in a bankruptcy sale that involved real estate encumbered by a lien. . . .
>
> Weigand undertook the engagement and sought buyers without knowing the extent to which the Bank intended to expend its claim or that it was a certainty that the

[4] A copy of this case is appended hereto as **Exhibit A.**

> Bank would thwart any cash deal with a credit bid. Often lenders are only too happy to get cash. . . .
>
> Weigand's activity in this case assisted in the disposition of the debtors' real estate and its ability to be compensated by a commission on the amount of actual cash bid for 500 Commerce should not be thwarted by the Bank's credit bid. By marketing the property and supplying a cash bidder, Weigand aided in the disposition of the property.
>
> The Court therefore concludes that Weigand is entitled to a six percent commission on the $800,000 cash bid of Sizewise, or $48,000. A surcharge in that amount pursuant to § 506(c) shall be assessed against the 500 Commerce property prior to its conveyance by the estate to the Bank and the Bank shall fund that amount in cash for payment to Weigand in accordance with its listing agreement.

437 B.R. at 694-696.

Permitting Give Back LLC to pay a buyer's premium of 3% only on any amount over and above its secured claim will serve to chill bidding, rather than foster competition in the bidding process. Indeed, such treatment will provide Give Back LLC with an unfair advantage above and beyond their secured status. If Give Back wishes to pay money in addition to its credit bid, fairness requires that the buyer's premium of 3% be calculated on the entire amount.

For illustration purposes only,[5] the following chart reflects what would happen if Give Back only pays a buyer's premium on the amount over and above its secured claim. Assuming *arguendo* that Give Back is authorized to credit bid a total amount of $25 million[6] and no other bidders come forward, Give Back would be the successful bidder at $25 million and would not be required to pay any buyer's premium. If, however, other bidders participate, the following would take place:

///

[5] This example is offered for illustration purposes only. The Trustee does not assert that any of these dollar figures reflect what the auction will actually produce. The Trustee offers these numbers merely to show the unfair disadvantage Give Back would obtain in the bidding process.

[6] This amount is lower than the undisputed amount of Give Back's claim and is offered for illustration only as an easy round number. The Trustee makes no representation or argument about the claim value in this chart.

| | ***Total Purchase Price*** | ***Buyer's Premium Assessed to a Third Party Overbidder*** | ***Buyer's Premium Assessed to Give Back as Overbidder*** |
|---|---|---|---|
| Opening Bid: Credit Bid by Give Back $25M | $25,000,000 | N/A | $0 |
| First Overbid: $250,000[7] over the initial credit bid of $25M | $25,250,000 | $757,500 | N/A |
| Second Overbid: $500,000 over initial credit bid of $25M | $25,500,000 | **$765,000** | **$15,000** |
| Third Overbid: $750,000 over initial credit bid of $25M | $25,750,000 | **$772,500** | **$22,500** |

As the foregoing illustration shows, Give Back would be afforded an entirely unfair advantage over third party bidders if it chooses to participate past its credit bid. Indeed, Give Back's continued participation costs nearly nothing, yet other overbidders pay a substantial amount more than Give Back to remain in the auction. This result would likely chill bids and not serve to foster a competitive bidding process. The Trustee submits that the Bid Procedures ensures that all bidders can bid on a level playing field. To be sure, if Give Back does not want to participate in overbidding, it can merely credit bid and go no further in the auction.

**C. The Sale Motion Scheduling Should Be Approved**

As noted above, given that the Trustee is seeking to conduct the auction sale on March 24, 2022, it is important that the Trustee obtain approval of the Bid Procedures as soon as possible so

[7] This is an estimate. Again, the Bid Procedures provide that the Trustee and Auctioneer have discretion to determine a proper overbid amount once bids are received, based on those opening bid offer(s).

that they can be provided to potential buyers, including by posting them on the marketing websites maintained by the Auctioneer. In proposing the Sale Motion Scheduling, the Trustee is sensitive to the fact that, on the one hand, the Auctioneer needs approximately six (6) weeks to adequately market these valuable real estate assets, and, on the other hand, needs to provide parties in interest with sufficient notice of the final sale. Given that the Bid Procedures include a proposed purchase agreement to be executed by the High Bidder(s) and any back-up bidder(s), the Trustee submits that holding a hearing to confirm the sale within one week of the Auction adequately balances these competing needs.

## III. CONCLUSION

Based on the foregoing, the Trustee respectfully requests that the Court enter an order granting this Motion, approving the Bid Procedures, approving the Sale Motion Scheduling, and granting such other and further relief as the Court deems just and proper under the circumstances.

DATED: February 17, 2022

BG LAW LLP

By: /s/ Jessica L. Bagdanov
David Seror
Jessica L. Bagdanov
Attorneys for Sam Leslie, Chapter 11 Trustee

**DECLARATION OF SAM S. LESLIE**

I, Sam S. Leslie, declare:

1. I am the duly appointed and acting chapter 11 trustee for the bankruptcy estates of Coldwater Development, LLC and Lydda Lud, LLC. I have personal knowledge of the facts contained in this declaration, and if called as a witness, I would and could competently testify thereto under oath.

2. I make this declaration in support of the foregoing Motion. All initial capitalized terms used but not defined herein have the meanings ascribed to them in the attached Motion.

3. In the course of employing the auctioneers, there were discussions about the circumstances under which Give Back would be required to pay a Buyer's Premium and how that amount would be calculated. While it was discussed that perhaps Give Back should be required to pay a Buyer's Premium on the difference between its credit bid and successful bid, it was ultimately determined that it would be fairer to other bidders and provide a more competitive bid process if Give Back were required to pay a Buyer's Premium on its entire successful bid not just the difference.

4. In my business judgment, I believe that in the event Give Back determines to bid in excess of its credit bid, and if Give Back is the successful bidder, then is fair and reasonable for Give Back to pay a Buyer's Premium calculated on the entirety of its bid.

5. It is my opinion and judgment that a fairer and more competitive auction will result if Give Back is required to pay a Buyer's Premium on the entirety of its bid.

6. A true and correct copy of the Bid Procedures for which I seek approval is attached hereto as **Exhibit 1.** I believe the Bid Procedures will maximize value of the Property for the benefit of this estate and request that they be approved.

7. A true and correct copy of the form Purchase and Sale Contract in substantially the form to be used by bidders is attached hereto as **Exhibit 2.**

8. The Notice accurately describes the marketing efforts that have already been undertaken and will be continued during the marketing process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of February, 2022, at Palm Springs, California.

Sam S. Leslie

**DECLARATION OF DAVID SEROR**

I, David Seror, declare:

1. I am an attorney authorized and licensed to practice law in this State and am a member of BG Law, counsel for Sam Leslie, the duly appointed and acting chapter 11 trustee for the bankruptcy estates of Coldwater Development, LLC and Lydda Lud, LLC. I have personal knowledge of the facts contained in this declaration, and if called as a witness, I would and could competently testify thereto under oath.

2. I make this declaration in support of the Motion. All initial capitalized terms used but not defined herein have the meanings ascribed to them in the attached Motion.

3. On February 9, 2022 a hearing was held on the Trustee's *Motion For Order Approving Retention of ThreeSixty Asset Advisors, LLC and WFS Inc., dba Tranzon Asset Strategies as Auctioneers Pursuant to 11 U.S.C. § 327 and Approving Auctioneer's Proposed Costs* (the "Motion to Employ") [Doc. 226]. In general, the Motion to Employ provides that a successful bidder on the Property (as defined in the Motion to Employ) would be required to pay a Buyer's Premium of 3% of the successful bid.

4. The court's tentative ruling raised the issue of compensation to the auctioneers if the property were sold to a credit bidder in light of a limited objection filed by Give Back. In response to this question, I stated that in the event secured creditor Give Back acquired the Property pursuant to a credit bid, no Buyer's Premium would be owed. That statement is correct, and is consistent with the Bid Procedures. *See*, **Exhibit 1.**

5. Then, the issue was raised about whether secured creditor Give Back would be required to pay a Buyer's Premium if it bids in excess of its credit bid amount. I responded that it would be required to pay a Buyer's Premium, however, I mistakenly also added that the Buyer's Premium would be based upon the difference between the successful bid and the credit bid amount. This statement was a mistake and is wrong, as reflected in **Exhibit 1.**

6. In the course of employing the auctioneer, there were several discussions with the Trustee and the auctioneers about the circumstances under which Give Back would be required to pay a Buyer's Premium and how that amount would be calculated. There were discussions about

limiting the amount of a Buyer's Premium required from Give Back to the difference between its credit bid and successful bid, it was ultimately determined that it would be fairer to other bidders and provide a more competitive bid process if Give Back were required to pay a Buyer's Premium on its entire successful bid not just the difference.

7. At the hearing on the Motion to Employ, I mistakenly referred to those prior discussions and not the final determination made by the Trustee that it would be a fairer and more competitive bid process if Give Back would be obligated to pay a Buyer's Premium on the entirety of its credit bid.

8. On February 9, 2022, after the hearing, I spoke with counsel for Give Back and told them that I had misspoke at the hearing and mistakenly stated that the amount of the Buyer's Premium required of Give Back would be the difference between its credit bid amount and the successful bid. I explained that while that concept had been discussed, it was ultimately determined by the Trustee that Give Back would be obligated to pay a Buyer's Premium on its entire successful bid if its bid exceeded its credit bid.

9. I apologized to counsel for this mistake and now apologize to the Court.

10. Efforts to arrive at a consensual order following the Motion to Employ were not successful. However, this Notice and **Exhibit 1** accurately set forth the proposed Bid Procedures for a sale of the Property.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 17th day of February, 2022, at Los Angeles, California.

David Seror

**Terms and Conditions of Sale**

1. **Auction Sale:** Tranzon Asset Strategies in association with ThreeSixty Asset Advisors, LLC ("Auctioneer"), as an agent of Sam S. Leslie, in his sole capacity as Chapter 11 Trustee ("Seller"), is conducting the auction sale of the real estate from case # 2:21-bk-10335-BB in the United States Bankruptcy Court, Central District of California, Los Angeles Division, in re Coldwater Development LLC jointly administered with Lydda Lud, LLC. The auction sale is subject to confirmation of the United States Bankruptcy Court.
2. **Properties:** The properties being offered are described below ("Properties"):

   **Los Angeles County Assessor's Parcel Number**

   4387-022-001

   4387-021-018

   4387-021-019

   4387-020-009

   4387-020-001

   4387-022-002
3. **Bid Deposit**:
   a. **Onsite Bidders-** Bids on the Properties will be accepted only from persons who attend the Auction, have in their possession a cashier's check in the amount of two hundred fifty thousand dollars ($250,000.00), payable to Sam Leslie, Chapter 11 Trustee and register with the Auctioneer prior to the Auction ("Qualified Bidders"). Only Qualified Bidders will be permitted to attend the auction.
   b. **Online Bidders -** A bid deposit in the amount of two hundred fifty thousand dollars ($250,000.00), payable to Sam Leslie, Chapter 11 Trustee will be required in order to bid. The deposit will be required in the form of a Cashier's Check, remitted to Seller no later than 48 hours prior to the auction date, which the Seller may hold until the completion of bidding and for a reasonable period of time to allow for the release of any such deposit and/or the return of any such funds after the conclusion of the auction. Online bidders will also be required to complete bidder registration forms as supplied by the Auctioneer, which will contain further instructions for remitting the deposit.
4. **Suggested Opening Bids and Offering**: The Properties will be offered with Suggested Opening Bid amounts. Auctioneer may offer the Properties for sale as individual parcels, in parcel groupings, and/or in their entirety. Auctioneer may reopen bidding over multiple rounds, whereby Qualified Bidders will be provided the opportunity to increase their bids and alter the parcel combination of their bids if such increases and alterations bring a better result to the Seller. The auction sale will not be deemed closed on any parcel or combination of parcels until Auctioneer announces the conclusion of the auction and determination of the highest and best bids. At such time, Seller, in his sole discretion, shall have the authority to accept or reject the high bids established by the Auctioneer.
5. **Opening Bid Incentive:** Auctioneer and Seller, in their sole discretion, may offer a Qualified Bidder who agrees to open the auction for one or more parcels at a bid amount acceptable to Auctioneer and Seller, minimum overbid protection of approximately 3% of their opening bid.
6. **Sale Subject to Confirmation:** The auction sale is subject to confirmation of the Seller in his sole and absolute discretion, who is selling solely in his capacity as Trustee and the high bidder only becomes the purchaser upon confirmation and acceptance by the Seller, and approval by the bankruptcy court following conclusion of the auction. The Seller is unconditionally authorized to decline to confirm the sale of the Properties and to cancel the sale of the Properties through close of escrow.
7. **Bid Increments**: Once a bid is received by the Auctioneer, advances on that bid must be made in increments at least as great as those which the Auctioneer, at his sole discretion, shall designate as being

necessary to surpass the last bid acknowledged by the Auctioneer. Should there be any dispute among competitive bidders for the Properties, the Auctioneer may reopen bidding on the Properties or he may, at his sole discretion, designate one of the bidders as the "High Bidder".

8. **Buyer's Premium:** A buyer's premium of three percent (3%) shall be added to the High Bidder's high bid price and become part of the total purchase price to be paid by the High Bidder.
   a. **Buyer's Broker.** In the event the Property is purchased by a third party represented by a registered broker, the buyer's broker will be paid 1% of the high bid, to be paid from the Buyer's Premium through escrow. The remaining 2% will be paid to the Auctioneers. In the event a third party buyer is not represented by a broker, 1% of the Buyer's Premium will be rebated back to the estate, with the remaining 2% paid to the Auctioneers.
   b. **Credit Bid.** In the event Give Back, LLC purchases any or all of the Properties for amount(s) up to its allowed credit bid, no Buyer's Premium will be assessed. In the event that Give Back, LLC purchases one or all of the Properties for a total exceeding its credit bid amount, then Give Back, LLC will be assessed the Buyer's Premium which shall be distributed as follows: 1.5% to the Estate and 1.5% to the Auctioneer
9. **Earnest Money Deposit:** At the conclusion of bidding on the property, the High Bidder will be required to confirm its bid amount and tender its $250,000.00 cashier's check as deposit. The High Bidder(s) will also be required to tender any necessary additional deposit to bring its total deposit to an amount equal to ten percent (10%) of the total purchase price ("Earnest Money Deposit"), payable within 24 hours following the auction. The additional deposit may be by cashier's check or wire transfer. The Earnest Money Deposit shall be held by Sam Leslie, Chapter 11 Trustee until close of escrow.
10. **Purchase Contract:** The High Bidder(s) will be required to sign a Purchase Contract ("Purchase Contract") immediately upon the completion of the auction. The Purchase Contract will set forth the "Purchaser", the "Seller", the "Broker(s)", and contain the precise terms and conditions of the sale. The Purchase Contract will be made available for review prior to the auction by the Auctioneer.
    The terms of the Purchase Contract are expressly not negotiable and the Purchase Contract must be signed in the name of the High Bidder and, except as may specifically be permitted by the terms of the Purchase Contract or expressly agreed upon in writing by the Seller or Auctioneer in their sole discretion, may not be assigned to any other person or party. The Purchase Contract and such other documents will set forth the specific terms and conditions of the sale, including the time by which the High Bidder's purchase of the Properties must be completed. Copies of these documents may be obtained from the Auctioneer, and it is bidder's responsibility to obtain, read, and understand the provisions of any such documents before bidding at this auction. The Seller's obligations to the High Bidder are exclusively as set forth in the Purchase Contract.
11. **High Bidder's Default:** If the High Bidder fails to close in a timely manner for any reason, the Earnest Money Deposit shall be immediately forfeited and released to Seller as liquidated damages and not as a penalty. Seller retains the unilateral right to cancel any escrow and retain the Earnest Money Deposit in the event the High Bidder fails to complete the purchase as required by the terms of the Purchase Contract. In addition, in the event the High Bidder fails to submit the executed Purchase Contract and any required Earnest Money Deposit as required by these Terms and Conditions and any additional terms and conditions, the High Bidder authorizes the Seller to retain the Earnest Money Deposit, in the sole discretion of the Seller. These remedies are in addition to any other remedies, including specific performance and/or additional monetary damages that the Seller and/or the Auctioneer may have in equity or at law. The Auctioneer and the Seller also reserve the right to immediately put the Properties up for sale again.
12. **No Conditions or Contingencies:** Without limiting the generality of the foregoing, bidders acknowledge and agree (i) that the completion of the sale following the conclusion of the auction is not contingent upon any inspection or verification of any such information, and the Closing Date or Closing Time (as defined below) will not be extended in order to permit any such inspection or review; (ii) that neither the Seller nor

the Auctioneer nor any broker participating in the transaction to which this auction relates shall have any liability for any relief, including damages of any kind, rescission or reformation of the Purchase Contract or adjustment to the terms of the Purchase Contract based upon any failure of the Properties to conform to any description contained in the Property Information Package or any other materials, or to any standard or any expectation that bidders may have in connection with the Properties; and (iii) that the completion of the sale is not subject to any financing or other contingency of any sort. Bidders represent and warrant that by registering to bid and bidding during the auction, bidders have conducted all necessary investigations, and have determined to place a bid relying solely on their own independent investigation or verification of material facts concerning the sale and the suitability of the Properties for their intended use.

13. **"AS-IS" Sale**: All bidders are encouraged to personally inspect the Properties and documentation relating thereto. The Properties are being sold "as-is, where is" with no representations or warranties whatsoever. The sale is not contingent upon inspection and will not be extended for that purpose. Neither Seller nor Auctioneer make any warranties or representations, either expressed or implied, concerning the Properties included in the sale. Neither Seller nor Auctioneer shall be liable for any relief, including damages, rescission, reformation, allowance or adjustment based on the failure of the Properties to conform to any standard or expectation.
14. **Due Diligence:** It is bidder's responsibility to obtain and read the Property Information Package relating to the Properties being sold at the auction, as well as any and all other information made available by the Auctioneer relating to this auction and the Properties being sold at the auction. Bidders acknowledge and represent that they have done so. Bidders further acknowledge that any information contained in the Property Information Package or otherwise obtained directly or indirectly from the Auctioneer and/or the Seller is being presented to the best of the Auctioneer's and the Seller's actual knowledge without independent verification. Therefore, it is the sole and exclusive responsibility of bidders to inspect the Properties; review the documents relating to the Properties; assess the accuracy and completeness of the information contained in the Property Information Package and any such other documents; and independently verify and confirm any estimates, projections, or assumptions relating thereto, none of which may be considered to be guaranties. In connection therewith, bidders have the sole and exclusive responsibility to select and consult with any and all professional advisors of their choosing in determining whether to bid at this auction. Bidders acknowledge that they have relied exclusively on their own investigations and determinations and the advice or their own professional advisors, and expressly represent that they have not relied upon any information provided by the Seller or the Auctioneer in any way, whether through the Property Information Package or other documents, through the Auctioneer's website(s), or by any oral, written or electronic communications with the Auctioneer or the Seller, or otherwise.
15. **Title:** The sale will be fee simple title by Quitclaim Deed, **as is**, with a standard coverage title policy provided by Seller at Buyer's expense subject only to current taxes, assessments, easements, rights-of-way, conditions, restrictions, other matters of record and any printed exceptions specified in the preliminary title report except monetary liens.
16. **Close of Escrow:** All sales must close within thirty (30) days but no sooner than fourteen (14) days following entry of the Court Order confirming the sale. If a High Bidder fail to close in a timely manner for any reason, the High Bidder's deposit(s) shall be immediately forfeited and released to Seller as liquidated damages and not as a penalty. Seller retains the unilateral right to cancel escrow and retain the deposit in the event the High Bidder fails to close as required by the terms of the Purchase Agreement.
17. **Closing Costs:** Property taxes will be pro-rated as of the date of Close of Escrow. The High Bidder will be required to pay closing costs, including, but not limited to escrow fees, document preparation fees, transfer taxes, recording fees, and property tax prorations.
18. **Broker Participation:** Broker participation is welcomed. A commission of 1% of the Buyer's Premium on the high bid price will be paid to the licensed California real estate broker whose prospect pays the entire

purchase price, including Buyer's Premium, and closes eon the Properties. To qualify for a commission, the real estate broker must: (a) be a licensed California real estate broker who will abide by the National Association of Realtors Code of Ethics, (b) sign an affidavit stating his/her involvement is serving only as broker and not as a principal, (c) first register the prospect by completing the Broker Registration Agreement (available from the Auctioneer's office) and returning it by fax to 949.727.9022 or e-mail to tcook@tranzon.com no later than 48 hours prior to the scheduled auction; and the registration form must be signed by the prospect and received before any inspection of the Properties by the prospect. The broker must be present at the auction to submit the bid with their prospect. Each broker must submit a copy of the faxed or e-mailed form when their prospect registers for the auction. A complete registration file on all prospects will be maintained. Commission will only be paid upon closing and receipt of commissions by Auctioneer.

19. **Definitions:** The auction company or companies conducting this auction is or are referred to as "we" or "our" or "Auctioneer", and references to the Auctioneer include all of the Auctioneer's employees, officers, directors, principals, employees, agents and other representatives. The Auctioneer is a member company in Tranzon, LLC and Tranzon International, LLC. All Tranzon member companies are independently owned and operated. Bidders are referred to as "you" or "your" or "Bidder(s)" in the Terms and Conditions. Bidders are required to acknowledge that they have read and understand these Terms and Conditions before they will be allowed to register for and bid at the auction.
20. **Agent for Seller:** The Auctioneer does not own the property being sold in this auction. The Auctioneer is representing the Seller exclusively in this transaction.
21. **Bidder Responsibility:** Bidders must take care in placing or entering bids, and each bidder will be responsible for all bids placed under the bidder's approved registration. Once entered and recorded onsite or online, a bid is deemed to be final on behalf of the registered bidder and may not be modified, retracted or rescinded in whole or in part.
22. **Technical Problems:** Auctioneer has made reasonable efforts to provide for online bidding for the auction. Bidders recognize and acknowledge, however, that technical problems with hardware, software, or internet connectivity, as well as human errors, may arise and may affect, without limitation, the Tranzon website, our online bidding program and process, bidders or Auctioneer's internet service and access, and bidder's connection to the bidding program and process. Bidders further acknowledge that these and other technical problems may develop at any time with or without notice. Bidders acknowledge and agree that neither the Auctioneer nor the Seller is in any way responsible for any such technical problems, and that bidders have no absolute or other right to be able to bid on this auction in the event of any such technical problems. Notwithstanding the foregoing, bidders further acknowledge and agree that, in the event of any such technical problems, Auctioneer reserves the right to postpone or cancel the auction and/or extend the bidding time for this auction and/or relist the Properties for auction at another time, at Auctioneer's sole discretion, and that Auctioneer's decision with regard to any such actions is and will be final.
23. **General Terms and Conditions:** Bidders acknowledge and understand that the Auctioneer reserves the right, for any reason or for no reason in the Auctioneer's sole discretion, (i) to determine who has access to and who may bid at this auction, (ii) to postpone or cancel the auction, (iii) to withdraw any Properties from the auction, (iv) to change any terms of the auction or particular conditions of sale upon announcement prior to or during the course of the auction, (v) to bid on behalf of the Seller up to the amount of any reserve price, where permitted by law, (vi) to reject any and all bids, (vii) to select the winning bid and (viii) to offer the Properties in any groupings and/or as a whole. Bidders further acknowledge that neither the Seller nor the Auctioneer nor any broker involved in the auction is making any representation or warranty as to the manner in which the sale process will be managed, and that, except as may otherwise be provided by law, any acceptance of a winning bid prior to the execution of a binding Purchase Contract may be rescinded by the Seller in the Seller's sole discretion and for any reason whatsoever including the receipt of a subsequent bid, and that the Seller's obligation to sell any

property or properties in this auction shall not be binding until such final Purchase Contract is signed and delivered by the Seller and the High Bidder. The Seller may sell the Properties in advance of the auction, in the Seller's sole discretion. The sole and exclusive venue for any disputes regarding or relating in any way to this auction or the transactions made in conjunction with this auction shall be in the United States Bankruptcy Court, Central District of California, Los Angeles Division, and bidders irrevocably submit to the jurisdiction of said court.

24. **Disclaimer:** Information contained herein is believed to be correct to the best of the Auctioneer's knowledge but is subject to inspection and verification by all parties relying on it. Sellers, their representatives and Auctioneer shall not be liable for inaccuracies, errors, or omissions. All dimensions are approximate. Prospective bidders should independently verify any and all information being materially relied upon in making a purchasing decision. This offering is subject to prior sale and may be withdrawn, modified or cancelled at any time without notice. The auction is being conducted pursuant to all local and state laws.

# PURCHASE CONTRACT AND RECEIPT FOR DEPOSIT

This is more than a receipt for money, it is a legally binding contract. Read it carefully.

Date: _________________ Los Angeles County, California

Received from ______________________________________________________________________________________

herein called Buyer, the sum of ______________________________ ("Deposit") evidenced by readily available funds payable to __________________________, as the deposit on account of a bid price of as follows:

a) High Bid $__________________

b) Buyer's Premium (=1a x 3%) $__________________

c) Total Purchase Price (=1a + 1b) $__________________

for the purchase of real property situated in _____________________ County, California and described as follows (the "Property"): ________________________________________________________________________________________

________________________________________________________________________________________________

1. Buyer will deposit into escrow with A&A Escrow ("Escrow Holder") the balance of the Total Purchase Price as follows:

**Balance of all funds necessary to close escrow is due 48 hours prior to the scheduled Close of Escrow in cash by wire transfer or immediately available federal funds to a bank account designated by Escrow Holder.**

2. This Purchase Contract and Receipt for Deposit ( "Contract") constitutes escrow instructions to the Escrow Holder and the Escrow Holder's general provisions are attached hereto and made a part hereof. All sales must close within fourteen (14) days following entry of the Court Order confirming the sale or such later date as is agreed to by the Seller in writing in his sole discretion. If a Purchaser fail to close in a timely manner for any reason, the Purchaser's depoit(s) shall be immediately forefited and released to seller as liquidated damages and not as a penalty. Seller retains the unilateral right to cancel escrow and retain the deposit in the event Purchaser fails to close as required by the terms of the Purchase Agreement.

3. Title is to be conveyed by Quitclaim Deed and is subject to the following: (a) current property taxes, (b) covenants, conditions and restrictions of record, (c) easements of record, (d) local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect relating to the Property, and (e) the rights of tenants, as tenants only, under any leases (collectively, the "Permitted Exceptions"). Seller shall furnish Buyer at Buyer's expense a standard coverage American Land Title Association owner's policy showing title to the Property vested in Buyer, subject to the Permitted Exceptions. Buyer acknowledges receipt of the Preliminary Title Report and agrees to accept title to the Property subject to the Permitted Exceptions, excepting monetary liens and encumberances which shall be eliminated by Seller prior to the Close of Escrow. If Seller is unable to furnish said Title Insurance Policy on the date set for the Close of Escrow, then Seller shall be given up to ninety (90) additional days to cure any defects and procure said Title Insurance. If Seller fails to deliver title as above, Buyer, as its sole remedy, may terminate this Contract and the Deposit shall be returned to Buyer.

4. Property taxes, rents and interest (if any) shall be pro-rated as of the date of Close of Escrow. Buyer will be required to pay closing costs, including but not limited to, document preparation fees, documentary transfer taxes, property tax

prorations, and their portion of of escrow fees. The Seller will pay standard coverage title insurance premiums and their portion of the escrow fees.

5. Possession of the Property shall be delivered to Buyer on the Close of Escrow.

6. **Unless otherwise designated in the escrow by Buyer, title to the Property shall vest as follows:**

________________________________________________________________________

7. **"AS-IS" CONDITION**. Except as otherwise specifically stated in this Contract the Property is sold **"As-Is, Where Is, With All Faults"**, in its present condition, with no representations or warranties of any kind or character, express or implied, whatsoever. Seller and their agents shall not be responsible for any relief, including damages, rescission, reformation, allowance or adjustment based on the failure of the Property to conform to any specific standard or expectation. Buyer acknowledges and agrees that Property is being sold in an “as is, where is, with all faults” condition and Seller makes no warranty or representation of any kind or character regarding the Property, including any structure thereon or any matter relating to such Property or any such structure and further acknowledges that no agent acting on behalf of Seller was authorized to make any such warranty or representation. Buyer acknowledges that Seller has not occupied the property and is not aware of any material facts affecting the value and desirability of the Property. Seller will not provide a Transfer Disclosure Statement, wood-destroying pest report, lead-based paint disclosure, mold disclosure or any other disclosure with regard to the condition of the property. Buyer acknowledges that Buyer is responsible for the cost of smoke detector compliance and water heaters to be properly anchored, braced or strapped. Buyer further acknowledges that it has been given a full and complete opportunity to investigate the Property, including the right and opportunity to obtain its own consultants to examine the Property, any structure thereon, title matters, the nature, provisions and effect of all health, fire, environmental, building, zoning, subdivision and other use and occupany laws, ordinances and regulations applicable thereto, and that Buyer is relying solely upon its own investigation and not upon any statement made by Seller or its agents. Buyer waives any right to rescind this transaction or to make a claim for damages based upon a claim of misrepresentation or omission by Seller or its agents and acknowledges that this waiver is a material part of the consideration to the Seller. Buyer and Buyer’s successors expressly waive any and all rights.

8. UPON CLOSE OF ESCROW, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER’S INVESTIGATIONS, AND BUYER, UPON CLOSE OF ESCROW, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER (AND SELLER’S OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS’ FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER (AND SELLER’S OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE PROPERTY. BUYER AGREES THAT SHOULD ANY CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS ON THE PROPERTY BE REQUIRED AFTER THE DATE OF CLOSING, SUCH CLEAN-UP, REMOVAL OR REMEDIATION SHALL BE THE RESPONSIBILITY OF AND SHALL BE PERFORMED AT THE SOLE COST AND EXPENSE OF BUYER AND SELLER SHALL NOT BE LIABLE TO BUYER FOR SUCH CLEAN-UP, REMOVAL OR REMEDIATION. AS PART OF THE PROVISIONS OF THIS SECTION 8, BUT NOT AS A LIMITATION THEREON, BUYER HEREBY AGREES, REPRESENTS AND WARRANTS THAT THE MATTERS RELEASED HEREIN ARE NOT LIMITED TO MATTERS WHICH ARE KNOWN OR DISCLOSED, AND BUYER HEREBY WAIVES ANY AND ALL RIGHTS AND BENEFITS WHICH IT NOW HAS, OR IN THE FUTURE MAY HAVE CONFERRED UPON IT, BY VIRTUE OF THE PROVISIONS OF FEDERAL, STATE OR LOCAL LAW, RULES OR REGULATIONS, INCLUDING, WITHOUT LIMITATION, SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH PROVIDES AS FOLLOWS:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Seller and Buyer acknowledge that the compensation to be paid to Seller for the Property has been decreased to take into account that the Property is being sold subject to the provisions of this Section 8. Seller and Buyer agree that the provisions of this Section 8 shall survive the Close of Escrow.

9. IF BUYER FAILS TO COMPLETE SAID PURCHASE AS HEREIN PROVIDED BY REASON OF ANY DEFAULT OF BUYER, SELLER SHALL BE RELEASED FROM HIS OBLIGATION TO SELL THE PROPERTY TO BUYER AND MAY PROCEED AGAINST BUYER UPON ANY CLAIM OR REMEDY WHICH HE MAY HAVE IN LAW OR EQUITY; PROVIDED, HOWEVER, THAT BY PLACING THEIR INITIALS HERE BUYER: ( ) AND SELLER: ( ) AGREE THAT SELLER SHALL RETAIN THE DEPOSIT AS HIS LIQUIDATED DAMAGES.

IF BUYER AND SELLER INITIAL THE ABOVE PROVISION, THEN BUYER AND SELLER AGREE THAT SELLER WILL INCUR DAMAGES BY REASON OF BUYER’S DEFAULT WHICH ARE IMPRACTICAL AND EXTREMELY DIFFICULT TO ASCERTAIN. BUYER AND SELLER, IN A REASONABLE EFFORT TO ASCERTAIN SELLER’S DAMAGES, HAVE AGREED BY INITIALING THE ABOVE PROVISION THAT THE TOTAL DEPOSIT SHALL BE DEEMED TO CONSTITUTE A REASONABLE ESTIMATE OF SELLER’S DAMAGES. ACCORDINGLY, IF BUYER DEFAULTS IN ITS OBLIGATION TO PURCHASE THE PROPERTY, SELLER SHALL HAVE THE RIGHT TO AN AMOUNT EQUAL TO THE DEPOSIT AS LIQUIDATED DAMAGES. THE DEPOSIT SHALL CONSTITUTE SELLER’S SOLE MONETARY REMEDY FOR BUYER’S SAID DEFAULT, UNLESS BUYER WRONGFULLY CONTESTS SELLER’S RETENTION OF SAID DEPOSIT, IN WHICH INSTANCE SELLER SHALL ALSO BE ENTITLED TO ALL COSTS AND EXPENSES, INCLUDING ACTUAL ATTORNEYS’ FEES, INCURRED BY SELLER AS A RESULT OF BUYER’S WRONGFUL ACTION.

THE ABOVE LIQUIDATED DAMAGES PROVISION SHALL NOT APPLY TO NOR LIMIT (A) ANY INDEMNITY PROVISIONS IN FAVOR OF SELLER, (B) ANY OF SELLER’S RIGHTS OR REMEDIES AGAINST BUYER WHICH ACCRUE FOLLOWING CLOSE OF ESCROW OR (C) SELLER’S RIGHT TO OBTAIN SPECIFIC PERFORMANCE FOR ANY BREACH BY BUYER OTHER THAN FAILURE TO PURCHASE THE PROPERTY.

10. Notwithstanding any term or provision of this Contract, if Seller accepts this offer, Buyer hereby delivers to Seller an amount equal to One Hundred Dollars ($100.00) from the Initial Earnest Money (the “**Independent Consideration**”) as independent consideration to Seller for having entered into this Contract. The Independent Consideration shall be nonrefundable if the Close of Escrow does not occur for any reason related to a Buyer termination under this Contract, or due to a failure of a condition to the Close of Escrow, and to the extent that this Contract requires any funds to be refunded to Buyer, any amount so refunded shall not include the Independent Consideration.

11. Effect of Infeasible or Unprofitable Sale. To the extent that liens, claims, encumbrances or other interests against the Property, if any, or any event, makes the sale infeasible or unprofitable to the Bankruptcy Estate, the Seller may cancel any proposed sale under this Agreement. In such case, the Buyer agrees to fully and completely release Seller from any and all obligations under this Agreement. In addition, any escrow shall be cancelled and the Buyer's deposit refunded.

12. Time is of the essence. All modifications or extensions to this Contract shall be in writing signed by the parties.

13. Buyer acknowledges that Seller is the Chapter 11 Trustee for the United States Bankruptcy Court, Central District of California/Los Angeles Division, Case No 2:21-bk-10335-BB / 2:21-bk-10336-BB. Any dispute or action pertaining to this Contract shall be brought in and shall be subject to the jurisdiction of said Court, or if that Court does not have jurisdiction for any reasons, in any court of competent jurisdiction located in Los Angeles County, California. In any such action or dispute the prevailing party shall be entitled to reasonable attorney's fees and costs.

14. Buyer acknowledges that this sale is to be submitted to and is subject to the confirmation and approval of the United States Bankruptcy Court, Central District of California/Los Angeles Division. Seller covenants to seek said approval from the Court at the earliest opportunity.

15. This Contract may be executed in multiple counterparts, all of which when taken together shall constitute one Contract. For purposes of executing this Contract, a document signed and transmitted by facsimile machine or telecopier or electronic mail shall be treated as an original document. The signature of any party thereon shall be considered as an original signature, and the document transmitted shall be considered to have the same binding legal effect as an original signature on an original document.

16. THIS CONTRACT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE FEDERAL LAWS OF THE UNITED STATES AND THE LAWS OF THE STATE OF CALIFORNIA.

17. Buyer acknowledges that Buyer has read and understands the terms and conditions of purchase as set forth in this Contract, and agrees to purchase the Property at, for and upon the terms of this Contract and for the stated Total Purchase Price. Buyer agrees that Buyer's execution and delivery of this Contract to Seller shall constitute an irrevocable offer to purchase made to Seller but shall not be binding upon Seller unless and until actually executed by Seller or Seller's duly authorized agent. Buyer hereby agrees that this offer shall remain irrevocable until 5:00 PM Pacific Time on the tenth business day following its execution of this Contract. Notice from Seller of its acceptance or rejection of Buyer's offer under this Section may be given by telephone and confirmed by letter at a later date. Failure of Seller to notify Buyer by the foregoing date and time that Seller rejects Buyer's offer shall not constitute an acceptance by the Seller of Buyer's offer.

Buyer Signature: ______________________________

Buyer: ______________________________

Address ______________________________

Telephone: ______________________ Fax: ______________________

Email: ______________________________

**ACCEPTANCE**

The undersigned Seller accepts and agrees to sell the Property on the above terms and conditions, subject to overbid and Court confirmation. Seller has employed Tranzon Asset Strategies and their agents as Broker/Auctioneer and agrees to pay for services per their agreement. The undersigned acknowledges receipt of a copy and authorizes Broker(s) to deliver a signed copy to Buyer.

Seller Signature: ______________________________________________

Seller: Sam S. Leslie, Chapter 11 Trustee

**Seller's Broker agrees to the foregoing and acknowledges receipt of the Deposit:**

Broker Signature______________________________ Date:____________________

WFS, Inc. dba Tranzon Asset Strategies
9891 Irvine Center Drive, Suite 200
Irvine, CA 92618
949.727.9011
BRE License 01850659

**Buyer's Broker agrees to the foregoing:**

Buyer Broker Signature: ______________________________________________

Broker: ______________________________________________

Firm:______________________________________________

Address ______________________________________________

Telephone: ______________________ Fax: ______________________

E-Mail:______________________________________________

BRE License:______________________________________________

2014 WL 1329822
Only the Westlaw citation is currently available.
United States Bankruptcy Court, C.D. California,
Los Angeles Division.

In re Kathleen KELLOGG–TAXE, Debtor.
Carolyn A. Dye, Chapter 7 Trustee, Plaintiff,
v.
Richard Taxe, an individual, Ronald Taxe, an individual, Massrock, Inc., a California corporation, Dwarfco Productions, Inc., a revoked Nevada corporation, and Does 1–20, inclusive, Defendants.

Bankruptcy No. 2:12–bk–51208–RN.
|
Adversary No. 2:13–ap–02019–RN.
|
Signed March 28, 2014.

**Attorneys and Law Firms**

Christian T. Kim, Dumas & Assoc., Los Angeles, CA, for Plaintiff.

John Saba, Newport Beach, CA, for Defendants.

**MEMORANDUM OF DECISION REGARDING CHAPTER 7 TRUSTEE'S "MOTION FOR PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER"**

Chapter 7

RICHARD M. NEITER, United States Bankruptcy Judge.

## I. INTRODUCTION

***1** This matter came before the Court on a motion by the Chapter 7 Trustee, Carolyn A. Dye (the "*Trustee* " or "*Plaintiff* "), for an order (1) preliminarily enjoining Defendants Richard Taxe, Ronald Taxe, Massrock, Inc. ("*Massrock* "), and Dwarfco Productions, Inc. ("*Dwarfco* ") (collectively, "*Defendants* "), from transferring community property assets of Debtor's estate; (2) appointing a receiver to liquidate the assets of Dwarfco, Massrock (whose stock is alleged to be the community property of Debtor and Richard Taxe, her husband) and the community property located at 5066 W. Jefferson Blvd., Los Angeles, California 90016 ("*Culver City Property* ");(3) compelling Defendants to turn over to the Trustee gemstones and a Wassily Kandinsky painting also owned as community property by Debtor and her husband; and (4) compelling Defendants to provide an accounting of any post-petition sales of the community property subject to the Trustee's Motion ("*Motion* ").

Ronald Taxe, the Debtor's brother-in-law; Massrock, a California corporation; and Dwarfco, a revoked Nevada corporation, opposed the Motion.[1] After hearing, the Court took this matter under submission and now renders its Memorandum of Decision containing its findings of fact and conclusions of law as required under Fed. R. Bankr.P. 7052.[2]

## II. JURISDICTION

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b) and 11 U.S.C. § 363. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## III. FINDINGS OF FACT

On December 18, 2012, the Debtor filed her voluntary chapter 11 petition. *See* Docket No. 1. This is the Debtor's fifth bankruptcy filing. The Debtor commenced four prior chapter 13 cases, all of which were dismissed shortly after they were filed. Three of the four prior bankruptcies were filed and dismissed within the year prior to the commencement of this case.[3]

In her first chapter 13 bankruptcy case (2:09–bk–29787–EC), Debtor claimed that she owned $40,000 worth of jewelry, $50,000 worth of paintings, a $3,000,000 life insurance policy of which she was the beneficiary, and a 50% ownership interest in Dwarfco[4] and Massrock, which she claimed was worth $4,000,000. *See* Plaintiff's Request for Judicial Notice ("*Pl.'s RJN* "), Exh. 1 (Adv. Docket No. 6). In her second, third, and fourth chapter 13 cases, Debtor continued to list on her schedules her ownership interest in Dwarfco and Massrock, claiming that her interest was worth only $2,500,000. *See* Pl.'s RJN, Exhs. 3, 5.)

After the filing of the current case, the Debtor failed to timely file any schedules and other required documents. On January 24, 2013, the Court entered an "Order Converting Case to a Case Under Chapter 7." *See* Docket No. 18. The Trustee was appointed on or about January 29, 2013. *See* Docket No. 20.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

EXHIBIT A

***2** In light of there being no automatic stay pursuant to § 362(c)(4)(A)(i) because of the Debtor's prior bankruptcy filings, the Trustee sought to impose a stay under § 362(c)(4)(B). *See* Docket No. 28. However, due to the untimeliness of the Trustee's motion, and other cause, the Court entered an "Order Denying Motion in Individual Case for Order Imposing a Stay or Continuing the Automatic Stay as the Court Deems Appropriate" on April 25, 2013. *See* Docket No. 53. As a result, there is no stay in this Debtor's case.

Debtor filed her amended schedules on May 13, 2013. *See* Docket No. 57. In her amended schedules, Debtor omitted any mention of her interest in Dwarfco and Massrock, and substantially reduced the value of her personal property. *See* Pl.'s RJN, Exhs. 6, 7.

On July 23, 2013, the Trustee conducted a Rule 2004 examination of Richard Taxe, the Debtor's husband. During his examination, Richard Taxe testified that:

(a) He owns no interest in any corporation (Declaration of James A. Dumas ("*Dumas Decl.*"), Exh. A, 39:9–11 (Adv. Docket No. 5));

(b) He owns valuable paintings, including a painting by Wassily Kandinsky ("*Kandinsky Painting* ") (*Id.* 51:8–52:5);

(c) He owns valuable gemstones ("*Gemstones* ") (*Id.,* 65:11–66:4);

(d) He has no written agreements with the Debtor (*Id.,* 26:17–19); and

(e) He signs checks on behalf of Massrock (*Id.,* 13:7–25).

Bank records for Massrock obtained by Plaintiff show Richard Taxe's signature on checks for personal expenses of the Taxe family. *See* Dye Decl., Exh. C (attached to Motion). In addition, Bruce Taylor, a former business associate of Richard Taxe, submitted a declaration in which he stated that he personally observed valuable paintings and other property belonging to Richard Taxe in storage at the Culver City Property. *See* Declaration of Bruce Taylor, ¶ 6 (attached to Motion).

On October 11, 2013, Plaintiff commenced an adversary proceeding against Richard Taxe, Ronald Taxe, Massrock, and Dwarfco for turnover of property of the estate and declaratory relief ("*Complaint* "). *See* Adv. Docket No. 1. In her Complaint, Plaintiff made the following factual allegations:

(a) Debtor and Richard Taxe have been married since at least 1984 and did not execute a marital agreement allocating the division of community property (Compl., ¶ 12);

(b) In 2009, Debtor acquired the Kandinsky Painting as a community property asset, which is currently in Ronald Taxe's possession, custody, or control (*Id.,* ¶ 13);

(c) In 1993, Richard Taxe acquired the Gemstones as a community property asset (*Id.,* ¶ 14);

(d) On or about September 24, 1990, Richard Taxe formed Dwarfco, and his and Debtor's interest in Dwarfco, if any still remains, is a community property asset (*Id.,* ¶ 15);[5]

(e) On or about December 12, 1996, Massrock was formed, with Richard Taxe as agent for service of process, as well as an officer, consultant, and/or shareholder with direct or indirect control of Massrock (*Id.,* ¶ 18);

***3** (f) Massrock is the holder of a bank account with deposits totaling approximately $50,000 ("*Massrock Account* "), which has funded the personal living expenses of Debtor and Richard for at least 10 years (*Id.*);

(g) Massrock is the record title owner of the Culver City Property, in which are stored "various artwork, rare books and antiques" (the "*Inventory* ") (*Id.,* ¶ 19); and

(h) Richard Taxe is at least a 50% owner of the Inventory, which was acquired during his marriage to Debtor and constitutes, at least in part, community property of the estate (*Id.*).

Plaintiff sought turnover of the community property pursuant to §§ 541 and 542, including the Kandinsky Painting, which Ronald Taxe and/or Richard Taxe refused to turn over; the Gemstones, which Richard refused to turn over; any interest Richard Taxe had in Dwarfco as community property, including Dwarfco's secured claim against the Boron Property, documentation for which Richard and Ronald Taxe refused to turn over; and Debtor's and Richard Taxe's interest in Massrock and Massrock's assets and property, including the Inventory and the Massrock Account. *Id.,* ¶¶ 5–7.

In addition, the Plaintiff sought declaratory relief as follows: (a) that Ronald Taxe has no right or claim to, interest in, or lien against the property of Dwarfco and/or successors in interest to Dwarfco, including the Note and any secured claim against the Boron Property; (b) that Ronald Taxe has no right or claim to, interest in, or lien against the property of Massrock, including the Inventory and Massrock Account; (c) that the property of Dwarfco and/or successors in interest to Dwarfco, including the Note and any secured claim against the Boron Property, is community property that should be administered in the Debtor's Estate; (d) that the property of Massrock is community property that should be administered in Debtor's Estate; (e) that Massrock is a sham corporation; and (f) that Dwarfco is a sham corporation. *Id.,* ¶¶ 7–8.

A summons was issued on October 11, 2013. *See* Adv. Docket No. 2. The summons and complaint were timely served on Defendants on October 14, 2013. *See* Adv. Docket No. 3. Plaintiff extended the answering deadline to November 15, 2013. *See* Declaration of Christian T. Kim, ¶ 2 (attached to Motion). Defendant Richard Taxe filed a timely answer on November 15, 2013 (Adv. Docket No. 8); and Defendants Ronald and Dwarfco filed their answer untimely on November 19, 2013 (Adv. Docket No. 9). Massrock did not file an answer.

On November 14, 2013, Plaintiff filed her Motion, in which she requested an order preliminarily enjoining Defendants from:

(a) Transferring any shares or inventory of Dwarfco or any interest in the Dwarfco Note and DOT and requiring them to turn over all original documents with respect to Note and DOT;

(b) Transferring any shares or inventory of Massrock or any interest in the Culver City Property and requiring them to turn over all original documents with regard thereto; and

***4** (c) Selling any of the Inventory located in the Culver City Property as of the date of Debtor's bankruptcy filing (December 18, 2012).

The Motion further requests an order:

(d) Appointing a receiver and authorizing the receiver to liquidate the assets of Dwarfco and Massrock and the Inventory that was located at the Culver City Property at the time of Debtor's bankruptcy filing pending the outcome of this adversary proceeding or the entry of a further Court order;

(e) Requiring Defendants to turn over to the Trustee possession of the Kandinsky painting described by Richard Taxe in his FRBP 2004 examination to be held in trust pending the resolution of this adversary proceeding;

(f) Requiring Defendants to turn over to the Trustee possession of all Gemstones that were in the physical possession of Richard Taxe as of the Debtor's bankruptcy filing, to be held in trust pending the resolution of this adversary proceeding; and

(g) Requiring Defendants to provide an accounting of any post-petition sales of any property that is the subject of this Motion.

The Notice of Motion and Motion were served on Defendants on November 14, 2013. Notice was defective by one day and challenged by Defendants Ronald Taxe and Dwarfco. *See* Adv. Docket No. 10. The Court continued the hearing to December 19, 2013 to allow for proper notice. The Court entered an interim order on December 6, 2013, granting the Plaintiff's Motion in part until the continued hearing date. [6] *See* Adv. Docket No. 14. Defendants Ronald Taxe, Dwarfco, and Massrock filed a timely opposition, with Defendant Richard Taxe filing a supporting declaration. [7] *See* Adv. Docket Nos. 16, 17. Plaintiff filed a timely reply. *See* Adv. Docket No. 18.

On November 18, 2013, Massrock filed a voluntary chapter 11 petition (Case No. 2:13–bk–37648–RN). As a result of Massrock's filing, Plaintiff withdrew, without prejudice, her Motion against Massrock. [8] Reply at 5.

At the December 19, 2013 hearing, the Court heard arguments from counsel and took the matter under submission.

If any of the above findings of fact are subsequently determined to be conclusions of law, they shall be deemed to be so designated.

## IV. CONCLUSIONS OF LAW

### A. *Preliminary Injunction*

A motion for a preliminary injunction can be brought pursuant to Federal Rule of Civil Procedure 65, which is incorporated by Federal Rule of Bankruptcy Procedure 7065. "The purpose

of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). A preliminary injunction imposed according to the procedures outlined in FRCP 65 has a limited lifespan, dissolving *ipso facto* when a final judgment is entered in the case. *U.S. Philips Corp. v. KBC Bank N.V.,* 590 F.3d 1091, 1093 (9th Cir.2010) (citing *Sweeney v. Hanley,* 126 F. 97, 99 (9th Cir.1903)).

***5** The movant has the burden, by a clear showing, that a preliminary injunction is proper. *See Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). For a preliminary injunction to issue, a movant must establish (a) that she is likely to succeed on the merits, (b) that she is likely to suffer irreparable harm in the absence of preliminary relief, (c) that the balance of equities tips in her favor, and (d) that an injunction is in the public interest (the "*Winter* Test"). *Winter v. NRDC, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citations omitted).

Alternatively, when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based on a likelihood of irreparable harm. *Winter,* 555 U.S. at 21. In applying this sliding scale, the Supreme Court rejected the Ninth Circuit's use of "possibility" of irreparable harm for the more stringent requirement of "likelihood" of irreparable harm explaining that the former is too lenient and is inconsistent with the Supreme Court's characterization that injunctive relief is an extraordinary remedy that is never awarded as a matter of right. *Id.* at 22 (citing *Munaf v. Geren,* 553 U.S. 674, 689–90, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008)).

**1. *Likelihood of Succeeding on the Merits***

Plaintiff seeks a preliminary injunction to preserve the status quo prior to the trial on her Complaint for turnover. Plaintiff brought her adversary proceeding for turnover against Defendants pursuant to §§ 541 and 542. Section 541 provides that property of the estate includes all interests of the Debtor and the Debtor's spouse in community property as of the commencement of the case. 11 U.S.C. § 541(a)(2). Under California law, all property, wherever situated, acquired by a married person during the marriage while domiciled in the state is community property. Cal. Fam.Code § 760. California law presumes that all property acquired during marriage is community property unless it falls within a limited list of specific exceptions, one of which is separate property. *In re Marriage of Haines,* 33 Cal.App. 4th 277, 289 (1995). The burden is on the spouse asserting its separate property character to overcome the presumption. *In re Marriage of Mix,* 14 Cal.3d 604, 610–11 (1975).

Here, Debtor and Richard Taxe married in 1984. Therefore, all property acquired by either spouse after that date is presumed to be community property absent evidence or an agreement to the contrary.

Plaintiff has pled sufficient evidence to prove that the Kandinsky Painting (acquired in or about 2009) and Gemstones (acquired in or about 1993) are community property and thus property of the Debtor's estate. *See supra,* II. Defendants do not appear to contest this conclusion. Reply at 2.

In addition, Plaintiff proffered sufficient evidence that Debtor has an interest in Dwarfco (formed in 1990), including any income received from the Dwarfco Note and DOT. Debtor claimed a 50% interest in Dwarfco in her prior bankruptcy schedules under penalty of perjury, and also claimed an interest in the Dwarfco Note and DOT. *See supra,* II. Defendant Ronald Taxe states in his declaration that he and his wife own stock in Dwarfco. *See* Declaration of Ronald Taxe ("*Ronald Taxe Decl.*"), ¶ 7. However, he does not state that they own 100% of the stock. Debtor did not file a declaration regarding this issue. As such, there is no evidence that Ronald Taxe and his wife own 100% of the stock. Defendants have failed to present sufficient evidence contradicting Debtor's alleged 50% interest in Dwarfco and the Dwarfco Note and DOT.

***6** Debtor's and Richard Taxe's interest in Massrock (formed in 1996) also appears to be community property and therefore property of the Debtor's estate, but the Culver City Property does not. Debtor's prior bankruptcy schedules show Debtor's 50% interest in Massrock.[9] *See* Pl.'s RJN, Exhs. 1, 3, 5. Moreover, Defendants' Opposition admits that Richard Taxe is a "minority shareholder" of Massrock, and therefore that Plaintiff is entitled to her share of any dividends distributed by Massrock. Opp'n at 4. However, Ronald Taxe states that he, and not Massrock, owns the Culver City property, and that the personal items contained therein are his. Ronald Taxe Decl., ¶¶ 4–6. Plaintiff does not present any evidence to contradict Ronald Taxe's claim that the Culver City Property is currently owned by him.[10] Based on the evidence submitted, it appears Debtor has an interest in Massrock, but not the Culver City Property.

As for the Inventory located in the Culver City Property, Plaintiff's sole evidence is contained within the Declaration of Bruce Taylor. Defendants challenge Mr. Taylor's motives and his standing as a creditor in Debtor's case, but do not conclusively rebut Plaintiff's allegations regarding ownership of the Inventory. The Court lacks sufficient evidence to determine whether Plaintiff is likely to succeed on the merits as to the Inventory. Therefore, the Court declines at this time to preliminarily enjoin Defendants as regards the Inventory.

Plaintiff has shown a likelihood of succeeding on the merits in her action for turnover of the Kandinsky Painting, the Gemstones, any interest Debtor and/or Defendant Richard Taxe has, or may have had, in Dwarfco, including Dwarfco's Note and DOT, and Debtor's and Richard Taxe's interest in Massrock, but not the Culver City Property or Massrock's other assets. The Court declines to rule on the Inventory held at the Culver City Property at this time.

**2. *Likelihood of Suffering Irreparable Harm in the Absence of Preliminary Relief; Balance of Equities; and Public Interest***

The remaining factors of the *Winter* test support Plaintiff's request for a preliminary injunction.

This case is Debtor's fifth bankruptcy case, which was filed on December 18, 2012 and subsequently converted to chapter 7 on January 24, 2013. Plaintiff argues that despite disclosing her interest in Dwarfco and Massrock in four prior chapter 13 filings, Debtor failed to disclose her interest in those assets in the pending case. *See* Pl.'s RJN at Exhs. 1–3, 5–6. Additionally, Plaintiff argues Debtor undervalued her "jewelry" at $1,000 (not including the valuation of the Gemstones), and failed to schedule the Kandinsky Painting altogether. *See id.* at Exh. 6.

Plaintiff contends that Debtor's failure to disclose is once again an attempt by Debtor to hide and devalue assets. Mot. at 16. Based on this history, the Plaintiff argues that an injunction is necessary to prevent Debtor, Richard Taxe, and Ronald Taxe from dissipating, disposing, or otherwise transferring the interest of the Debtor's estate in the disputed property. Without an injunction, Plaintiff contends that the estate will likely be irreparably harmed as Debtor and Defendants will likely continue to do everything in their power to prevent Plaintiff from acquiring the disputed property for the benefit of the Debtor's estate and the creditors entitled to share in those assets.

***7** The estate may suffer irreparable harm based on Richard Taxe's admission that he is trying to sell the Kandinsky Painting, *see* Dumas Decl., Exh. A, 51:11–13; that he frequently trades the Gemstones and has only "some" left (that are either in his possession or his brother's), *see generally* Dumas Decl. at Ex. A. Debtor also failed in the pending bankruptcy case to disclose her interest in Dwarfco and Massrock, and any income they may be generating from them and/or any community property that may be held on Dwarfco's or Massrock's premises or at the Culver City Property.

In addition, as a result of Debtor's conduct and the likelihood of Plaintiff's prevailing and of the irreparable harm to the estate and its creditors if the preliminary injunction is not granted, the balance of equities tips in Plaintiff's favor. However, Plaintiff is silent on the public interest to be considered in granting a preliminary injunction. Nevertheless, based on Plaintiff's Motion, it appears that granting such an injunction would ensure that the assets are preserved for the Debtor's estate and its creditors, a concept that has considerable support as a matter of public interest . [11]

Therefore, the Court finds that the *Winter* Test is satisfied and preliminarily enjoins Defendants Richard Taxe, Ronald Taxe, and Dwarfco from: (i) transferring the Kandinsky Painting and Gemstones; (ii) transferring any shares or inventory of Dwarfco, or any interest in the Dwarfco Note and DOT, and requiring them to turn over all original documents with respect to the Dwarfco Note and DOT; and (iii) transferring any shares or interest in Dwarfco or Massrock. However, with respect to the Inventory held at the Culver City Property and Massrock's assets, the Court declines to rule at this time due to the § 362 stay in Massrock's bankruptcy case.

**B. *Appointment of Receiver***

Plaintiff also seeks an order appointing a receiver and authorizing the receiver to liquidate the assets of Dwarfco and the Inventory located at the Culver City Property at the time of Debtor's bankruptcy filing, pending the outcome of this adversary proceeding or a further order of this Court.

No controlling Ninth Circuit case addresses this issue. Section 105(b) expressly provides that "a court may not appoint a receiver in a case under this title." Nevertheless, "[t]his section only prohibits appointment of a receiver in a case under title 11. It does not prohibit the appointment of a receiver in a related adversary proceeding if otherwise

authorized and appropriate." 2 *Collier on Bankruptcy* ¶ 105.06 (16th ed.2011) (citing *Craig v. McCarty Ranch Trust (In re Cassidy Land & Cattle Co.),* 836 F.2d 1130, 1133 (8th Cir.1988) and *In re Mem'l Estates, Inc.,* 797 F.2d 516, 520 (7th Cir.1986)). [12]

In *In re Cassidy Land & Cattle Co.,* the Eighth Circuit held that that "[t]he power of the bankruptcy judge precluded by section 105(b) of the Bankruptcy Code is the power to appoint a receiver *in lieu of a trustee.* " 836 F.2d at 1133 (citing *In re Mem'l Estates, Inc.,* 797 F.2d at 520) (emphasis added). Despite this limitation, the Eighth Circuit further clarified that Section 105(b) does not preclude a bankruptcy court from appointing "a receiver at the request of the trustee for the limited purpose of administering the mortgaged property pending disposition of the foreclosure proceeding." *Id.*

***8** In support of her request, Plaintiff cites to California law, arguing that a court may appoint a receiver for numerous reasons, including "[w]here a corporation is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights" and "[i]n all other cases where necessary to preserve the property or rights of any party." Cal.Code Civ. Proc. §§ 564(b)(6), (b)(9). [13]

Here, Plaintiff argues that appointing a receiver is warranted with respect to Dwarfco and its assets. Dwarfco is a revoked corporation that has forfeited any right to transact business and is not a debtor in its own bankruptcy case. Plaintiff, as Trustee, has an obligation to maximize the Debtor's estate's interest in the Dwarfco Note and DOT, which is currently at issue in the Carlton bankruptcy. *See supra,* note 4.

As noted above, Plaintiff has voluntarily withdrawn her Motion as to Massrock, which is currently involved in its own chapter 7 case.

With respect to the assets held at the Culver City Property, Plaintiff argues that creditor Harriet Goslins will have foreclosed on the Culver City Property well before this adversary proceeding is resolved. As a result, the assets stored at the Culver City Property will need to be moved and stored at a new location.

Defendants do not address the receiver issue, and Plaintiff only cites State law reasons for appointing a receiver. Plaintiff does not address whether her request for the appointment of receiver would violate § 105(b) or case law, or would otherwise replace her functions as chapter 7 trustee.

Nevertheless, the Court finds that appointing a receiver is warranted for the limited purpose of taking possession of and preserving Dwarfco's assets and inventory. [14] Appointing a receiver for this limited purpose would protect the interests of Debtor's estate and of creditors, without overlapping with Plaintiff's functions as Trustee. *See In re Mem'l Estates, Inc.,* 797 F.2d at 520 (authorizing a bankruptcy court's appointment of a receiver pending resolution of a foreclosure action, in part because the receiver was "not engaged in liquidation, which normally is the function of the trustee rather than a receiver").

Therefore, the Court grants Plaintiff's request for a receiver for the limited purpose of taking possession of and preserving Dwarfco's assets and inventory, but denies Plaintiff's request to allow the receiver to liquidate any property turned over to Plaintiff prior to the resolution of disputes as to title to any such property in this adversary proceeding or further order of this Court.

**C. *Additional Relief***

Plaintiff further requests the following relief:

(1) Requiring Defendants to turn over to the Trustee possession of the Kandinsky Painting to be held, in trust, pending the resolution of this case.

(2) Requiring Defendants to turn over to the Trustee possession of all Gemstones that were in the physical possession of Richard Taxe as of date of Debtor's bankruptcy filing to be held, in trust, pending the resolution of this case.

***9** (3) Requiring Defendants to provide an accounting of any post-petition sales of property that is the subject of this Motion.

The Court grants requests (1), (2), and (3) above (except as to Defendant Massrock) given Richard Taxe's testimony that he is attempting to sell the Kandinsky Painting and that he frequently trades the Gemstones, of which only "some" remain. The Court also finds grounds to require Defendants Richard Taxe, Ronald Taxe, and Dwarfco to provide an accounting of any post-petition sales or encumbrances of any property that is the subject of this Motion. In prosecuting her adversary proceeding, Plaintiff will conduct discovery to determine any post-petition sales of any property that is the subject of this Motion and of her Complaint. A good starting point will be the requested accounting.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

If any of the above conclusions of law are subsequently determined to be findings of fact, they shall be so designated.

**V. CONCLUSION**

In light of the foregoing, the Court grants in part and denies in part Plaintiff's Motion. Until further order of this Court preliminarily enjoins Richard Taxe, Ronald Taxe, and Dwarfco from transferring, disposing of, or hypothecating the following assets:

a. The shares of Dwarfco;

b. The assets and inventory of Dwarfco;

c. That certain Note and DOT and assignment of rents in favor of Dwarfco as described in the Motion and recorded in the County of Kern as Document No. 0208089126;

d. The shares of stock in Massrock;

e. The Kandinsky Painting; and

f. All Gemstones within the possession, custody, or control of Richard Taxe, Ronald Taxe, or Dwarfco.

The Court also orders that the Kandinsky Painting and the Gemstones be turned over to Plaintiff, to be held in trust pending the resolution of the current adversary proceeding or further order of this Court. The Court further orders Richard Taxe, Ronald Taxe, and Dwarfco to provide an accounting of any and all post-petition sales or encumbrances of any real or personal property that is the subject of this Motion.

The Court grants in part Plaintiff's request for a receiver for the limited purpose of taking possession of and preserving Dwarfco's assets and inventory, pending the resolution of this adversary proceeding or further order of this Court. The Court denies Plaintiff's request to allow the receiver to liquidate any potential community property of the estate prior to the resolution of this adversary proceeding or further order of this Court.

The foregoing constitutes the Findings of Fact and Conclusions of Law and based thereon Plaintiff's counsel is directed to prepare and submit an order consistent with this Memorandum of Decision.

**All Citations**

Slip Copy, 2014 WL 1329822

## Footnotes

1 Although he did not join the other Defendants in opposing Plaintiff's Motion, Richard Taxe submitted a supporting declaration. *See* Adv. Docket No. 17.

2 Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330. "Rule" references are to the Federal Rules of Bankruptcy Procedure ("*FRBP* "), which make applicable certain Federal Rules of Civil Procedure ("*F.R.Civ.P.*"). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("*LBR* ").

3 The Debtor's four prior bankruptcy filings include:

| Case No. | Date Filed | Date Dismissed |
|---|---|---|
| 2:09–bk–29787–EC | July 30, 2009 | October 16, 2009 |
| 2:12–bk–33767–NB | July 12, 2012 | August 20, 2012 |
| 2:12–bk–40808–SK | September 10, 2012 | October 1, 2012 |
| 2:12–bk–44947–WB | October 17, 2012 | January 29, 2012 |

4 Dwarfco is a revoked Nevada corporation and the beneficiary to a deed of trust ("*Dwarfco DOT* ")with a secured claim of approximately $1,139,286.26 that encumbers real property in Boron, California ("*Boron Property* "), currently owned by Carlton Global Resources, LLC ("*Carlton* ").Mot. at 8. In her chapter 13 schedules, Debtor claims that mortgage income on account of her ownership interest in Dwarfco would resume after the completion of Carlton's chapter 7 bankruptcy (Case No. 6:10–bk–48739–SC). *See* Plaintiff's

Request for Judicial Notice ("*Pl.'s RJN* "), Exh. 8. No payments have been made to Debtor's estate in connection with the Dwarfco DOT since at least the conversion of the Debtor's bankruptcy case. *See* Declaration of Carolyn A. Dye ("*Dye Decl.*"), ¶ 5. On August 15, 2013, the Carlton bankruptcy was converted to a chapter 7 case. *See* Pl.'s RJN, Exh. 10.

5 Dwarfco's corporate charter was revoked in 2007. *See* Pl.'s RJN, Exh. 11. Because of Dwarfco's revoked status, Plaintiff "alleges that Richard and/or Ronald, as individuals, are successors in interest to any secured claim Dwarfco may have against the Boron Property," and that any interest in Dwarfco asserted by Debtor or Richard Taxe in the Carlton bankruptcy is community property of the estate. Compl., ¶¶ 16–17.

6 The Court's December 6, 2013 interim order (Adv. Docket No. 14) provided that:

1) Defendants shall be enjoined from selling, transferring, disposing of or hypothecating the following assets and as described in the Motion:

a. The shares of Dwarfco and Massrock;

b. The assets and inventory of Dwarfco and Massrock;

c. Any gemstones within the possession, custody or control of any of Defendants;

d. Any antiques or artwork within the possession, custody or control of any of Defendants;

e. Any antiques, artwork or gemstones located at the Culver City Property;

f. That certain deed of trust and assignment of rents in favor of Dwarfco as described in the Motion and recorded in the County of Kern as Document No. 0208089126.

2) The injunction specified herein shall expire at the close of business on December 19, 2013, unless further extended by the Court.

3) Defendants may file a supplemental opposition to the Motion by no later than December 9, 2013.

4) Plaintiff may file a reply brief by no later than 12/12/2013.

7 Defendant Dwarfco appears to be a revoked Nevada corporation. Pursuant to F.R.Civ.P. 17(b)(2), which is incorporated by FRBP 7017, a corporation's capacity to sue or be sued is determined by the law of the state in which it was organized. Nevada law expressly provides that a revoked corporation's right to transact business is forfeited. Nev.Rev.Stat. § 78.175(2) (2013). As a result of Dwarfco's revoked status, the Court does not consider Dwarfco's opposition in ruling on Plaintiff's Motion.

8 On December 9, 2013, the United States Trustee filed a motion to dismiss or convert Massrock's case pursuant to § 1112(b)(1). On December 19, 2013, Creditor Harriet Goslins and Janey Sweet filed a motion to dismiss Massrock's chapter 11 case with a bar on refiling. The Court denied Goslins' and Sweet's motion but granted the United States Trustee's motion. An order converting Massrock's case to chapter 7 was entered on February 18, 2014.

9 Because of Massrock's pending bankruptcy case, Plaintiff has voluntarily withdrawn her Motion as to Massrock and Massrock's assets, without prejudice should Massrock's bankruptcy case be dismissed. Nevertheless, Plaintiff's withdrawal does not alter her request as to turnover of Richard Taxe's share certificates in Massrock. Reply at 5.

10 However, Massrock's interest in the Culver City Property appears to have been extinguished when Harriet Goslins, et al. successfully quieted title thereto, as evidenced by a state court judgment entered on July 9, 2013. *See* Defendant's Request for Judicial Notice, Exh. 3.

11 "Indeed, courts have found there is a strong public interest in the preservation of a debtor's assets for the purpose of paying creditors...." *In re Howard,* 422 B.R. 593, 605 (Bankr.W.D.Pa .2010), *aff'd,* Case No. 2: 10CV962, 2011 WL 578777 (W.D.Pa. Feb. 9, 2011) (citing *In re Metiom, Inc.,* 318 B.R. 263, 272 (S.D.N.Y.2004)).

12 *See also Balakian v. Balakian,* Case No. CV–F–07–1011 OWW, 2008 WL 2705393 (E.D.Cal. July 8, 2008), *decision modified on reh'g,* Case No. CV–F–07–1011 OWW, 2008 WL 4539481 (E.D.Cal. Oct. 10, 2008) ("Although 11 U.S.C. § 105(b) precludes appointment of a receiver 'in a case under this title,' section 105(b) does not preclude appointment of a receiver in an adversary proceeding to foreclose a lien ..." (citing *In re Cassidy Land and Cattle Co., Inc.,* 836 F.2d at 1133).)

13 Plaintiff erroneously cites to Code of Civil Procedure § 565 in her Motion. (Mot. at 19.)

14 Because of the § 362 stay in Massrock's bankruptcy case, the Trustee is enjoined from taking possession or controlling Massrock's assets. However, should Massrock exit bankruptcy or if its § 362 stay is modified or terminated, the Trustee may exercise her right to ask the Court for an order expanding the receiver's duties to take possession and preserve Massrock's assets for the benefit of the Debtor's estate and its creditors. The Court also finds that a receiver is not warranted to take possession of and preserve the Inventory located at the Culver City Property. Plaintiff has not presented sufficient evidence at this time that the Inventory is community property and therefore property of Debtor's estate.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367.

A true and correct copy of the foregoing document entitled: **CHAPTER 11 TRUSTEE'S NOTICE OF MOTION AND MOTION TO: (I) APPROVE AUCTION AND BID PROCEDURES REGARDING THE SALE OF REAL PROPERTY; AND (II) SET SCHEDULING FOR A MOTION TO APPROVE THE SALE OF REAL PROPERTY; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF SAM S. LESLIE AND DAVID SEROR** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 17, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Eryk R Escobar eryk.r.escobar@usdoj.gov
- M Douglas Flahaut flahaut.douglas@arentfox.com
- Eric J Fromme efromme@tocounsel.com, stena@tocounsel.com
- Asa S Hami ahami@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com; cblair@sulmeyerlaw.com;ahami@ecf.inforuptcy.com
- Christopher J Harney charney@tocounsel.com, stena@tocounsel.com
- Sam S Leslie (TR) sleslie@trusteeleslie.com, trustee@trusteeleslie.com;C195@ecfcbis.com
- Daniel A Lev dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com
- William N Lobel wlobel@tocounsel.com, jokeefe@tocounsel.com;sschuster@tocounsel.com
- Aram Ordubegian ordubegian.aram@arentfox.com
- Ronald N Richards ron@ronaldrichards.com, morani@ronaldrichards.com
- David Seror dseror@bg.law, ecf@bg.law
- Annie Y Stoops annie.stoops@arentfox.com, yvonne.li@arentfox.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
- Dylan J Yamamoto dylan.yamamoto@arentfox.com
- Robert M Yaspan court@yaspanlaw.com, tmenachian@yaspanlaw.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **February 17, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

****JUDGE'S COPY UNDER 25 PAGES IS SUSPENDED (GENERAL ORDER 21-05).**

Honorable Sheri Bluebond
United States Bankruptcy Court
255 East Temple Street, Suite 1534
Los Angeles, CA 90012-3332

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 17, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 17, 2022 | Mela Galvan | /s/ Mela Galvan |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**3. SERVED BY OVERNIGHT MAIL:**

Bel Air Project LLC
9454 Wilshire Blvd. #320
Beverly Hills, CA 90212

Closing Agents Escrow, Inc. **VIA NEF**
c/o Law Offices of Robert M. Yaspan
21700 Oxnard Street Suite 1750
Woodland Hills, CA 91367-7593

Coldwater Development LLC
11301 W. Olympic Blvd. #537
Los Angeles, CA 90064

Construction Enterprise & Services
11301 W. Olympic Blvd. #537
Los Angeles, CA 90064

First Credit Bank,
a California banking corporation
9255 Sunset Blvd.
West Hollywood, CA 90069

IRS
ATTN Insolvency
24000 Avila Road, Mail Stop 5503
Laguna Niguel, CA 92677-3405

Land Phases Inc.
5158 Cochran St.
Simi Valley, CA 93063

Larry A. Rothstein
2945 Townsgate Rd., Suite 200
Westlake Village, CA 91361

Law Offices of Adulaziz, Grossbart
and Rudman
6454 Coldwater Canyon Ave.
North Hollywood, CA 91606

LEA Accountancy, LLP
1130 S. Flower Street
Suite 312
Los Angeles, CA 90015-2143

Lennie Liston, Esq.
PE, QSD/QSP - President
LC Engineering Group, Inc.
889 Pierce Court, Suite 101
Thousand Oaks, CA 91360

Lincoln Resorts an AZ Joint
Venture Prt
c/o Freeman Freeman & Smiley LLP
1888 Century Park East St 1500
Los Angeles CA 90067

Lydda Lud, LLC
11301 W. Olympic Blvd. #537
Los Angeles, CA 90064

Mohamed Hadid
11301 W. Olympic Blvd. #537
Los Angeles, CA 90064

Mohamed Hadid
638 North Faring Road
Bel Air, CA 90077

Office of Finance
City of Los Angeles
200 N Spring St RM 101 City Hall
Los Angeles CA 90012-3224

Aram Ordubegian **VIA NEF**
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065

Permits Unlimited
4340 Caleta Rd.
Agoura Hills, CA 91301

RAL Design and Management Inc.
Russell Linch
25031 W. Avenue Standford Unit 100
Valencia, CA 91355

Securities & Exchange Commission
444 South Flower St., Suite 900
Los Angeles, CA 90071-2934

Shahbaz Law Group
15760 Ventura Blvd., Ste. 850
Encino, CA 91436

State of California Department of
Industrial Relations
6150 Van Nuys Blvd # 105
Van Nuys, CA 91401

Tree Lane LLC
11301 W. Olympic Blvd. #537
Los Angeles, CA 90064

Treetop Development LLC
11301 W. Olympic Blvd. #537
Los Angeles, CA 90064

**3. SERVED BY UNITED STATES PRIORITY MAIL:**

Employment Development Dept.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section MS: A-340
P.O. Box 2952
Sacramento, CA 95812-2952

Give Back LLC
P.O. Box 11480
Beverly Hills, CA 90213

Internal Revenue Service
Centralized Insolvency Operations
PO BOX 7346
Philadelphia PA 19101-7346

Los Angeles County Treasurer and Tax
Collector
Bankruptcy Unit
PO Box 54110
Los Angeles CA 90054-0110

Los Angeles Department of Water
and Power
P.O. Box 51111
Los Angeles, CA 90051